Michael L. Cohen, SBN 206253
MICHAEL L. COHEN, a PLC
707 Wilshire Boulevard, Suite 4100
Los Angeles, California 90017
Telephone:  (213) 943-6800
Facsimile:  (213) 943-6850
michaellcohen@cohen-law.org

Attorneys for Plaintiff Ira A. Daves

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| IRA A. DAVES,<br><br>                 Plaintiff,<br><br>vs.<br><br>ERIC H. HOLDER, JR., Attorney<br>General of the United States.<br><br>                 Defendant. | Case No.   CV 08-07376-CAS(AGRx)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**[Pursuant to 42 U.S.C. Sections 2000e *et seq.,* as amended]**<br><br><u>**JURY TRIAL DEMANDED**</u> |

This First Amended Complaint is based on Daves' personal knowledge and upon information and belief.

/ / /

/ / /

FIRST AMENDED COMPLAINT

## JURISDICTION & VENUE

1.     This suit is for damages and injunctive relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* as amended.  This Court therefore has subject matter jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

2.     This Court may properly assert personal jurisdiction over the parties in this case.  Daves resides in Los Angeles, California, and he submits to this Court's jurisdiction.  The United States Attorney for the Central District of California ("USAO"), where Daves is employed, is also located in this judicial district.

3.     Venue is proper under 28 U.S.C. § 1391(b).  All or most of the events or omissions giving rise to Daves' claims occurred in this judicial district.

## THE PARTIES

### The Plaintiff:  AUSA Ira Daves

4.     Daves is currently employed as an Assistant United States Attorney ("AUSA") in the Civil Division of United States Attorney's Office for the Central District of California (the "USAO").  The USAO is an agency and instrumentality of the federal government and is subject to the laws of the United States.  The United States Attorneys and their assistants serve as the nation's principal litigators under the direction of the Attorney General.  Each United States Attorney is the chief federal law enforcement officer of the United States within that particular jurisdiction.  United States Attorneys

/ / /

conduct most of the trial work in which the United States is a party, including prosecuting and defending civil cases in which the United States or one of its agencies is a party.

### The Defendant: U.S. Attorney General, Eric Holder

5.    Defendant Eric H. Holder, Jr. ("Defendant") is the Attorney General of the United States.  He heads the Department of Justice ("DOJ").  Holder is substituted under Fed.R.Civ.P. 25(d) for Michael B. Mukasey, the former Attorney General, who was originally named as the Defendant in this action.  The DOJ is an agency and instrumentality of the federal government and is subject to the laws of the United States. The Executive Office for United States Attorneys ("EOUSA") is an agency and instrumentality of DOJ and is also subject to the laws of the United States.  EOUSA was created to provide for close liaison between DOJ and the United States Attorneys Offices throughout the country.  During the relevant time periods, EOUSA was charged with, among other duties, providing general executive assistance and supervision to USAO.

### INTRODUCTION

6.    Daves has worked for approximately fourteen years as a civil litigator in the USAO.  His practice has focused on employment discrimination ("Title VII") cases. When Daves was first hired, he was told that working for the USAO would be the best job he ever had, and for years he believed it was.  For years, the managers at USAO told Daves that he was one of its top civil trial attorneys.  He was treated as though his advice was wanted and well-received  He felt genuinely valued as an employee and colleague.  He was provided adequate administrative support.  He enjoyed a good rapport with

3

FIRST AMENDED COMPLAINT

management.  He consistently obtained excellent results in the cases he handled for the office and its client agencies.  Through most of his tenure, he enjoyed his job.  Daves was proud to serve as a Civil AUSA, and he received numerous accolades for his many accomplishments.

7.    Over time, unfortunately, Daves' relationship with management gradually changed.  The shift began when Daves sought to challenge management on certain minority issues, such as the under-representation of African-American and Hispanic males in the office.  The shift became more pronounced when Daves sought to expand his practice and develop expertise in areas outside the limited field of Title VII.  Although USAO made a show of continuing its support of Daves, his persistence in exploring ways in which to best serve the needs of the office while concurrently improving work conditions in the office and expanding his practice area had the effect of unsettling and upsetting management, which wanted, because of certain personal biases, to preserve the status quo and restrict Daves' significant work experience to Title VII cases almost exclusively.

8.    Management was willing occasionally to assign Daves simple cases outside Title VII, but it ultimately became clear that heavy-duty, non-Title VII work was being reserved for other attorneys and was off-limits to Daves.  In time, because Daves would not acquiesce in the unfair restriction being placed upon him and because he continued his efforts to improve working conditions and opportunities for minorities and other

/ / /

historically disadvantaged groups, the support that he previously received from his managers—so essential to an attorney's career—dissipated and then disappeared.

9.     Since Daves' initial requests to increase his development opportunities by expanding his practice area, Daves' supervisors, all of whom reported directly to the Civil Chief, uniformly and without good reason denied him meaningful work outside of Title VII. These same supervisors praised his work. One supervisor wrote glowingly in one of Daves' performance appraisals, for example: "Ira possesses outstanding legal research and writing skills. His written work is thorough, timely, and forceful." "Ira is exceptionally thorough in the development of his cases. He serves as a resource to the office in the area of Title VII litigation in which he specializes. These cases are factually complex and highly emotional." "Ira is exceedingly effective in his case management and brings systemic problems to the immediate attention of his supervisors."

10.    Despite such consistently favorable comments throughout his 14-year tenure, Daves' supervisors never permitted or even asked him to train a new attorney in litigation, even for a Title VII case. They denied him these opportunities even as they told him that, as a senior attorney, he was expected to mentor and assist junior attorneys. The rare dual assignment Daves was afforded with a junior AUSA was only at Daves' repeated request and typically only in an emergency.

11.    At the same time, no such restrictions were placed on the vast majority of Daves' similarly situated AUSAs, most of whom were white. The Civil supervisors have given numerous if not nearly every one of these other civil AUSAs, junior and senior

attorneys alike, a meaningful and wide variety of challenging, career-enhancing assignments, including non-emergency dual assignments intended to train and assist newer attorneys.

12.     When Daves asked his managers why they insisted that he continue to focus on Title VII, in isolation and without any significant interaction with junior attorneys, management gave various responses that seemed plausible at the time. At the same time, management repeatedly assured Daves that there was no reason he would not someday be assigned the kinds of cases he had been requesting. Daves believed his managers. But unknown to him, they had started secretly trying to find some articulable basis to deny Daves' requests permanently.

13.     On January 31, 2008, management told Daves that it now had that articulable basis. The Civil Chief held a disciplinary-type meeting in which he informed Daves that he had uncovered deficiencies in Daves' performance dating back "a year or two." The Civil Chief further informed Daves that those performance deficiencies now precluded Daves from being assigned to the kinds of non-Title VII cases he had been requesting for years.

14.     Daves was blindsided. Before the January 31st meeting, his managers had never told about these alleged performance problems, so he had no opportunity to address them before his managers had made their decision. In fact, just a few days earlier, Daves had received his annual performance appraisal, and he again received the highest possible

/ / /

overall rating.  Consequently, management's justification for the decision to formalize the denial of equal treatment was highly suspect.

15.    Yet additional information was conveyed to Daves at the January 31, 2008 meeting.  In an environment in which EEO lawyers at EOUSA were disproportionately African-American, the Civil Chief specifically and unequivocally told Daves that he had been hired as "a Title VII lawyer," which is inconsistent with what Daves was told when he was offered the position.  The import of the meeting was that, in his managers' view, Daves was a "Title VII lawyer" and would remain one as long as he worked in Civil. Daves, who had devoted some of his most productive working years to litigating cases for the Civil Division of the USAO, was demoralized.

16.    Management's decision had a decided nexus to race and gender bias, as well as punishment for employment activity protected by Title VII.  For thirteen of the fourteen years that Daves has worked for USAO, he was the only African-American male employed in General Civil.  It was not until the year 2008, after Daves appealed management's decision through EEO channels, that a second African-American male was hired.  Daves also is openly gay.  And, throughout his career, Daves sought chances to thrive within the office at the same time that he pursued changes that would improve it. To that end, Daves engaged on multiple occasions in Equal Employment Opportunity ("EEO") activities, such as implementing measures designed to increase diversity within the office, all of which were intended to improve the working conditions within the office / / /

and fortify the USAO's stated mission as an Equal Opportunity employer.  It was those EEO activities that constituted protected forms of expression under Title VII.

17.     The events of January 31, 2008 compelled Daves to realize—reasonably and for the first time—that the difference in the treatment he had received in terms of his case assignments and other job opportunities was, in fact, due to unlawful discrimination and retaliation for some or all of his prior EEO activities. In a work environment where white and more recently Asian attorneys were routinely and aggressively hired, mentored, and promoted by an all-white management team over the few equally qualified African-American and Hispanic attorneys who have dedicated many years of exemplary service to the office, the insinuation that the sole African-American male attorney that had been hired in over a decade did not have the mettle for heavy-weight litigation outside the single area of employment discrimination was patently offensive.

18.     On January 31, 2008, Daves reasonably concluded, for the first time and with great disappointment, that persons of influence within USAO management—particularly the supervisors who had long managed the Civil Division—shared the unflattering, unsupported, and unsupportable view that it was all but impossible to find and hire qualified African-American and Hispanic male attorneys.  Daves also concluded that management had relied on its distorted, race-based view of his abilities to perpetuate and excuse decades of apathy and neglect in recruiting, training, retaining, and promoting these men.  Daves reasonably concluded that management's view of African-American and Hispanic females was similarly distorted.  Finally, Daves reasonably concluded that

management harbored unflattering stereotypes about the leadership potential of people such as Daves, whom they felt did not conform to racial and gender stereotypes.

19.   Without knowing or suspecting it, Daves entered the USAO reporting to and trying to impress a number of influential managers who harbored biases against two of the historically disadvantaged groups to which he belongs.  From the start, the default assumption for Daves, in the minds of these supervisors, has been that he is somehow not as good as his similarly situated white counterparts, that his aptitude for first-chairing high-exposure cases outside Title VII is somehow inferior to theirs, that he is, by comparison, no more than minimally or questionably competent.

20.   In the year following the January 31, 2008 meeting, management has firmly stuck by its adverse decision yet has declined to offer Daves any evidence supporting the offensive default assumption on which it was implicitly based.  Moreover, other AUSAs, particularly white males, have not been comparably disadvantaged.  In direct contravention of well-established Title VII principles, Daves has been steadfastly denied an equal chance to succeed or fail based on his individual merits.

21.   It was very difficult, if not impossible, for USAO management and their direct reports at EOUSA to admit any wrongdoing.  Their legitimacy as employment authorities within DOJ would have been questioned and their ability to exercise discretion in the future would have been undermined.  Therefore, when Daves first complained to the appropriate DOJ officials about unlawful discrimination, he was met not with pronounced interest or concern but with resistance, which reinforced Daves as *persona*

*non grata* in the office.  Soon thereafter, and in direct response to the complaint Daves lodged with their superiors at USAO and EOUSA, Daves' managers commenced carefully coordinated steps designed not only to punish, silence, and discredit him, but also to deflect attention away from their past and present discriminatory practices.

22.    In particular, the managers of Civil—all of whom have enjoyed lengthy careers in government and who were acting in flagrant self-interest to protect their reputations at the expense of a hard, honest evaluation of the facts—enjoyed personal and professional relationships with high ranking officials both within USAO and at EOUSA. Faced with the charges Daves leveled regarding unlawful conduct, these managers relied upon these relationships to bolster their own credibility and thwart any meaningful investigation of the issues raised by Daves' complaint.

23.    The collusion crystallized during the administrative processing of Daves' complaint.  The EEO office of the EOUSA, to which USAO management also reports, unduly delayed commencing any investigation for six months.  The investigator it finally assigned to the matter was adversarial and gave the matter only cursory attention,  In a response to a complaint that focused on disparate treatment in case assignments and other job opportunities, for example, Daves was required to produce proof of facts as inconsequential as overseas plane travel he took in the year 2007, while Civil management wasn't even asked, let alone required, to produce a single document demonstrating and explaining their assignment practices.  In this way, and in others, management-level officials at the USAO and EOUSA worked collectively and

aggressively to undermine Daves' efforts to investigate the systemic problems alleged in his complaint, perhaps the ultimate form of retaliation.

24.     The other forms of retaliation Daves has experienced since he first contacted EEO in February 2008 have been skillful, relentless, and continue to this day. In the year after he filed his original complaint, to list a few examples: management has repeatedly passed Daves over for career-enhancing assignments, has given him one rookie assignment after another, has played a series of administrative pranks on him each of which was designed to occupy his work time and undermine his morale, has bad-mouthed him and segregated him from his colleagues, and most recently has even tried to set him up for a swift, just-cause termination.

25.     Because of these concerted efforts to punish and silence him, Daves' health has deteriorated.  He was forced recently to take a leave of absence, at his doctor's advice.

26.     The lack of effective self-regulation by the USAO and EOUSA makes judicial intervention imperative.  With Title VII, Congress intended to address discrimination arising from an imbalance of power and an abuse of that imbalance that targets certain groups.  Although there has been a recent change in administration, with the November 2008 election of Barack Obama, such an imbalance still exists in the USAO's Civil Division in Los Angeles and, upon information and belief, at higher levels within the USAO and EOUSA.  This discrimination and retaliation deprives Daves and others like him of the right to participate on a level playing field with their peers.  This matter is now ripe for strict judicial scrutiny.

## FACTS

27.     As the U.S. Supreme Court observed in *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82 (1998), "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." For this reason, Daves sets forth the facts in detail.

### Daves' Career as an AUSA

28.     Daves received his J.D. from Harvard Law School, where he as an editor of the *Harvard Law Review*. After law school, Daves clerked for the Hon. Alfred T. Goodwin of the U.S. Court of Appeals, Ninth Circuit.

29.     After three years as an associate at O'Melveny & Meyers, Daves accepted an offer to join the USAO as an AUSA in October 1995. Daves joined the USAO in part because he believed in the USA's obligation to "do justice": the USA must not only zealously represent its clients (the federal government and its various agencies), it also has an obligation to ensure that justice is served and that the cause of justice is advanced.

30.     The docket of a civil AUSA consists of defending federal agencies and federal employees in all kinds of civil lawsuits. Thus, when he was hired, Daves was told that he serve as a general civil litigator. He was told that he must be willing and able to prosecute or defend any kind of civil case.

31.     Over the last 14 years, Daves has established an exemplary record, as attested to by multiple supervisors, clients, fellow AUSAs, and support staff with whom he has

worked.  During most of that time, Daves was proud to work for the USAO and was willing to place the office's interest above his own, even at the expense of his own immediate career goals.  He did as he was told, got favorable results in the vast majority of his cases—which were mostly Title VII cases—and Daves was repeatedly rewarded for his hard word and effective advocacy.

32.  Daves has been recognized with numerous commendations, including one that Leon W. Weidman—the Chief of the Civil Division throughout Daves' tenure—called "one of the most impressive commendations letters I have ever received."  Daves has received multiple honors, including a Special Achievement Award for Sustained Superior Performance of Duty.  He received a highly coveted nomination for a Director's Award because, according to the U.S. Attorney at that time, Daves deserved "nationwide recognition for his superior performance."  Soon after the nomination, the U.S. Attorney assigned Daves to assist the DOJ in a high-profile pattern-and-practice investigation of a local police department.

33.  That pattern-and-practice investigation was a decade ago.  Since then, Daves' career at the USAO has steadily stalled, eventually reaching a dead-end.  Daves hit this dead-end because of a disagreement with his managers over the types of cases Daves is qualified to handle versus the types of cases they're willing to give him.  The types and complexity of cases that an AUSA handles largely determines his career in the USAO, so this dispute raises fundamental questions about Daves' present and future marketability and earnings potential, particularly in these difficult economic times.

FIRST AMENDED COMPLAINT

34.      Throughout his employment at the USAO, Daves has engaged in EEO activities, formal and informal.  These activities include recruiting minority attorneys through his service on the USAO's hiring committee, serving as the office's Special Emphasis Program Manager responsible for representing minority interests to management, giving deposition testimony in connection with a co-worker's Equal Employment Opportunity ("EEO") complaint, voicing disapproval of the office's ostensibly neutral but effectively discriminatory policies and practices with respect to the hiring of externs, criticizing management's case assignment practices to DOJ auditors, and filing the EEO complaint underlying this action.

35.      After contentedly devoting his first several years to Title VII cases, Daves tried to expand his areas of substantive experience by working on substantial cases in other areas in addition to his Title VII cases.  Yet Daves' managers consistently refused to assign him substantial or important cases other than Title VII.  This refusal arises from his managers' prejudice—conscious, unconscious, or some combination of both.

36.      Daves' managers offered various reasons for confining Daves to Title VII, reasons that seemed plausible at the time and that Daves understandably accepted.  Daves was told, for example, that there was a shortage of attorneys who had the ability or experience to handle Title VII cases, which were among the most difficult cases in the office and which therefore required Daves' particular training and expertise.  Daves accepted that explanation until he started noticing that most of the newest, least experienced attorneys in the office were routinely assigned Title VII cases.  When he

pressed the issue, management offered other reasons, all of which seemed credible at the time.

37.    Daves' managers occasionally would assign him simple cases outside Title VII.  Daves accepted these cases without complaint, thinking that his managers would one day assign him tougher ones.  Once Daves became a senior litigator in the office, all but a few of his assignments were cases that could have been assigned to junior attorneys but were instead assigned to Daves.  These were dead-end assignments.  Further, many of these cases were pending in the Eastern and Southern Divisions of the Central District, which forced Daves to spend a disproportionate amount of his time traveling to the federal courthouses in Riverside and Santa Ana.

38.    Similarly situated AUSAs outside of Daves' protected classes did not have the same or similar degree of Title VII duties, long-distance travel, or other case-related burdens that Daves' managers repeatedly imposed on him.  Moreover, in a profession that places a premium on attorneys who can litigate any case, many if not most of Daves' fellow Civil AUSAs routinely received—often from the moment they were hired—a wide array of weighty assignments, which they litigated individually or as dual assignments with other other AUSAs.  In the case of experienced AUSAs, dual assignments would team them with less experienced attorneys, who received training by virtue of the partnering.

39.    Other times, experienced attorneys would be called upon to assist attorneys who had equal or more experience, including supervisors, at trial or in pre-trial

preparation.  There were occasions when white male attorneys with no prior Title VII trial experience were asked to assist colleagues in Title VII trials.  In contrast, Daves was never asked to provide any such assistance—not once in 13 years, not even in Title VII trials.  When Daves was not assigned a Title VII case, he was regularly given rookie-level assignments.  This freed up other, apparently favored, attorneys to litigate more important matters, through which their development into seasoned, well-rounded civil litigators was assured.

40.    Opportunities to advance in the Civil Division were—and remain—few and far between.  When they arise, candidates for promotion are required to demonstrate a wide variety of skills for litigating complex cases and for managing other attorneys.  These skills cannot be developed or demonstrated through the kinds of teeth-cutting cases that Daves was repeatedly assigned over the years.

41.    A few examples of the complex cases that Daves' colleagues were typically assigned:  a *Bivens* case involving shootings by federal officials; a complex, multi-defendant commercial litigation involving allegations of trademark infringement, unfair competition, and interference with prospective business advantage; a case under the Voting Rights Act challenging the outcome of city-wide elections; an environmental case involving the construction of wharfs; a civil suit seeking to enjoin businesses from operating on protected Indian reservations; and multiple medical malpractice cases involving severe injuries, such as retinal detachments and spinal displacements.

/ / /

42.     Daves' managers resisted his efforts to address this disparate treatment. Instead of honestly and fairly responding to his concerns, Daves' managers took pre-emptive action to avoid and, if necessary, defend against a future formal charge of discrimination. They began to impose on Daves a series of secret tests through which Daves could ostensibly prove himself. These obstructions were designed to concoct a pretext for refusing to assign Daves complex cases outside Title VII.

43.     Although unaware that he was essentially being set-up, Daves did everything asked of him. For example, one of these tests was a last-minute Ninth Circuit argument that Daves handled for a colleague who had a scheduling conflict. The Civil Appellate Chief reported to her colleagues that Daves' performance was "magnificent."

44.     One reasonably would have expected management to respond to Daves' success by assigning him the cases he had been requesting. But that did not happen. Instead, management continued to look for reasons not to assign these cases to Daves.

45.     Upon information and belief, management's plan was implemented with acquiescence from, if not the express concurrence of, executive members of the Front Office at USAO and upper-level officials at EOUSA. To the extent these high-ranking officials relied upon information, it came from Daves' supervisors. These officials did not consult with Daves or, upon information and belief, review his performance in any meaningful way to determine whether Daves' managers had a legitimate basis for implementing their plan.

/ / /

46.     Daves could not have known that management was manufacturing a pretext for denying him the opportunities that his track record had earned him because management's decision-making process was secret.  The particulars of most of management's actions, such as the factors on which management based a promotion decision, remained confidential.  Line attorneys were not provided such information, and it would not have been provided had it been requested.  Any charge of racism, sexism, or retaliation necessarily would have to be based on inference and educated guesswork.  Also, based on the favorable comments the Civil managers continued to give him, Daves reasonably believed that he enjoyed good, honest relationships with his managers.

47.     For instance, during a private discussion with the Chief of the Civil Division, Leon W. Weidman, Daves asked if there was anything he needed to do to be assigned more substantial cases outside Title VII.  Weidman assured Daves that there was no problem, that Daves needed do nothing more to get the cases he had been requesting for so long, and that it was just a matter of time before Daves would receive such assignments.  Through their confidential—and, Daves mistakenly thought, honest— exchanges, Chief Weidman lulled Daves into trusting him.  Chief Weidman later used the information he gathered during these private discussions and other conversations to bolster his pretext for denying Daves the assignments he had been requesting and, by all objective indications, had fairly earned.

48.     On January 31, 2008, Weidman finally disclosed his previously hidden intentions.  In an official, closed-door meeting that lasted two-and-a-half hours, Chief

FIRST AMENDED COMPLAINT

Weidman told Daves that he had made a decision about Daves' future assignments.  In the presence of Daves' direct supervisor, Chief Weidman told Daves that, for reasons that had come to his attention over the course of the past year or two, he would no longer consider Daves for the types of complex cases outside Title VII that Daves had long been requesting, absent improvement in Daves' performance.

49.     Throughout the meeting, Chief Weidman was demeaning and hostile.  He described Daves as arrogant and insufficiently grateful for the numerous Title VII and *pro per* cases that he had been assigned.  He attacked Daves for taking notes, even though he had previously invited Daves to take notes during the meeting.  Whenever Daves tried to present his side of events or defend himself, Chief Weidman cut him off.  He called Daves "bright" but said—in a moment of inaccurate historical revision—that he had hired Daves as "a Title VII lawyer."

50.     Daves was blindsided.  Before the meeting, Daves had never been told of performance problems that were sufficient to deny him cases outside of Title VII.  Now, Chief Weidman claimed to have found some over the preceding year or two.

51.     When Daves objected that Chief Weidman had never before mentioned these alleged deficiencies, Chief Weidman blurted, "*I'm telling you now!*"  Rather than provide specific facts, Chief Weidman mentioned vague "communication" problems and "numerous complaints" lodged against Daves, to which he had personally responded over the past year or two.  Chief Weidman said: "You have no idea how many times I've had

///

FIRST AMENDED COMPLAINT

to defend you."  When Daves asked for specifics, Chief Weidman demurred, declining to identify the complainants or reveal any particulars.

52.    Upon information and belief, Chief Weidman refused to provide the particulars because there were none to give.  Only days before the January 31st meeting, Daves had received—again—the highest possible performance rating for his work in the prior year.  A year or two of complaints requiring Chief Weidman's personal intervention would not have supported the rating that Daves had just received.

53.    Daves' direct supervisor remained silent throughout most of the meeting.

54.    The January 31st meeting was a seminal event in Daves' career as an AUSA. Chief Weidman admitted that neither he nor Daves' direct supervisor had bothered to outline before the meeting the specific goals and objectives that they had already put in place.  Thus, they effectively denied Daves a fair chance to satisfy the secret expectations they had expected him to meet.  Indeed, in the preceding year or two, when the complaints were purportedly pouring in, Chief Weidman had not bothered to tell Daves that he was being watched closely and that Daves' failure to correct perceived problems would result in corrective disciplinary action.  For Daves, the entire episode was humiliating.

55.    Chief Weidman had thus based his adverse decision on Daves' purported failure to meet goals and objectives that he had been kept secret from Daves.  To this day, those goals, objectives, and expectations remain vague and largely unspecified.  Moreover, neither Chief Weidman nor any other manager has raised the issue again.  No one has even mentioned to Daves his purported shortcomings or the secret standards that Chief

Weidman first presented to Daves at the January 31st meeting, which took place more than

a year ago. To this day, Daves has no idea whether management has retracted the

decision or continues to expect Daves to improve his performance according to the secret

standards to which Chief Weidman alluded during the meeting.

56.    On January 31, 2008, Daves realized for the first time what was happening.

The inconsistences and contradictions underlying Chief Weidman's decision were not the

product of innocent managerial error. Upon information and belief, under Chief

Weidman's direction and apparently with support or acquiescence from the Front Office,

Daves' managers had been taking steps to keep Daves where they wanted him—on the

front line of the federal government's defense in employment discrimination cases and off

the fast-track for promotional opportunities. As Chief Weidman put it at the January 31st

meeting, Daves was a "Title VII lawyer," nothing more.

57.    The designation "Title VII lawyer" has a particular historical significance in

the federal government. In 2008, nearly every attorney-advisor in the EEO department of

EOUSA was African-American. Given that, the term "Title VII lawyer" could reasonably

be understood as a code word for "black lawyer." The intent to discriminate was thus

implicit in Chief Weidman's comment. Use of that particular phrase in the context of

justifying case restrictions conveyed the message, particularly when viewed from the

perspective of a black man who had spent years in a mostly white work environment, that

black attorneys like management considered Daves and persons like him discrimination

lawyers, that they were suited for nothing else and nothing more, that they were not full

and equal members of the workplace who should be allowed the opportunity to try any case, however complex or outside their prior area of training or expertise, thus justifying management's decision to restrict their opportunities.

58.    Chief Weidman's decision—which he said was made after consulting "HR" and his superiors in the Front Office—revealed management's previously hidden intent to prevent Daves' development in favor of other similarly situated attorneys whom Chief Weidman and other supervisors preferred. Accordingly, while experienced white male attorneys were given career-enhancing assignments, some of them dual assignments with less experienced attorneys, to handle high-exposure *Bivens* cases, for example, Daves and other disfavored attorneys were relegated to more routine cases and encouraged to apply for extra-curricular work outside the office.

59.    In addition to these other acts of discrimination, Daves was denied a promotion to which he was fairly entitled.  Chief Weidman also made negative comments about Daves when Daves applied for a magistrate judgeship.

60.    Even if discriminatory choices like these were a reflection of clients' preferences, that fact would not excuse this discrimination because client preferences based on race or gender stereotypes are not a "bona fide occupational qualification" under Title VII.

**A History of Discrimination in the USAO**

61.    The DOJ purports to be "committed to providing a focused EEO program that prevents and eliminates discrimination and ensure equality in the workplace.  DOJ

has issued additional statements expressing its commitment to equal opportunity, such as: "Effective recruitment and outreach efforts support the Department's critical mission of ensuring fair and impartial administrative of justice for all Americans." Unfortunately, the history of minority representation in the Civil Division of the USAO in Los Angeles suggests otherwise.

62.   In the Civil Division's history, there has been only one minority supervisor — an Asian male.  Chief Weidman, a white male, has served as the Civil Chief for over 16 years.  The First Assistant Chief is also a white male, and his tenure has been longer than Chief Weidman's.  As a practical matter, the Civil Division's two top managers hold positions that are tantamount to lifetime appointments.  They demand and receive substantial deference from their subordinates, including supervisors who report to them.

63.   The management of the General Civil section of the Civil Division also includes four Assistant Division Chiefs and one Civil Appellate Chief.  These Assistant Division Chiefs include two white males and three white females.  Three of these Assistant Division Chiefs have have tenures as supervisors approaching and perhaps exceeding 20 years.

64.   All General Civil supervisors report directly to Chief Weidman.  The Civil Appellate Chief also serves as one of the two initials points of contact for employee grievances, including EEO complaints.  The prior Civil Appellate Chief was also a white female.  Both women received their promotions to the Appellate Chief position during Chief Weidman's tenure.

65.     When Chief Weidman and his male deputies started in the office in the 1980s and 1990s, there were few minority attorneys, if any.  Female attorneys were similarly rare.  From October 1995 to January 2008, the Civil Division hired at least 12 white males and seven white females.  During that same time period, the Civil Division hired no more than a handful of Asian attorneys—most most of them in the last few years—two Hispanic women, and one African-American woman.  And during that same period, attrition among minority AUSAs was disproportionately high:  whereas most white attorneys in General Civil remained in their positions for at least seven years, most of the minority attorneys resigned from or transferred out of General Civil within two to four years.

66.     From the time that he joined the USAO in 1995 until early 2008, Daves was the only African-American male in General Civil.  Upon information and belief, before Daves joined the office, there had been only one other African-American male attorney to work in General Civil, and he transferred to the Criminal Division before he passed away.  It wasn't until 2008 that Civil management hired another African-American male—a graduate of Yale Law School—to work in General Civil.  Thus, for thirteen of his fourteen years in the office, Daves was the sole African-American male attorney.  Furthermore, both of the African-American males hired into General Civil were from Ivy League law schools.  In contrast, the vast majority of Caucasian attorneys in General Civil—including supervisors—were not.  Although graduating from an Ivy League law school does not make someone a better attorney, this fact suggests that the managers in

the Civil Division are imposing on African-American men and other disfavored groups higher standards that they do not impose on other, favored groups.

67.    Dating back 25 years, no African-American, male or female, has ever held the post of U.S. Attorney for the Central District.

68.    Hispanic males have been similarly under-represented. From the time Daves was hired as an AUSA in 1995, General Civil has employed no Hispanic male attorneys. Daves believes that, before he was hired, only one Hispanic male attorney had been hired to work in General Civil. That attorney left the office before Daves started. The only other Hispanic male attorney hired to work in the Civil Division was placed in the Asset Forfeiture section, which historically employed a disproportionately higher percentage of African-American attorneys. Indeed, Chief Weidman initially offered Daves a position in Asset Forfeiture, which Daves declined.

69.    At the USAO, people of African-American and Hispanic descent have been historically employed in disproportionate numbers as support staff, janitors, and security guards. This has been especially true for African-American and Hispanic men.

70.    The Civil Division has an externship program, to which students from accredited law schools throughout the country apply. The externship program provides an excellent recruitment tool for the office. In fact, a number of AUSAs who ultimately received offers of full-time employment were identified through the program. Yet African-American and Hispanic attorneys have rarely been hired as externs. Out of

/ / /

probably more than 150 externs hired over a 13-year period, perhaps only two or three have been African-American or Hispanic.

71.   Merit-based awards are critical for career advancement, both within and outside the office.  Few African-American or Hispanic attorneys had been nominated for Director's Awards.

72.   As a result of poor or non-existent retention efforts, attrition among African-American and Hispanic attorney has been disproportionately high.

73.   A number of AUSAs have been promoted during Weidman's tenure as Chief of the Civil Division.  Of the various promotions, all but one have gone to white females.

74.   Executive positions in the Front Office are the top-ranking positions at the USAO.  During the time that Daves has been in the office, no African-American has held an executive position in the Front Office.  During Daves' tenure, no minority has ever held a management-level AUSA position in the Civil Division.  Similarly, during Daves' tenure, no African-American, male or female, has ever been promoted to a supervisory administrative position.

75.   The discrimination evidenced by these facts is underscored by comments that have been made to Daves or about Daves.  During his initial interview for the position, Daves inquired about promotional opportunities.  He was told flat out that there were none.  At times, unflattering comments were made about Daves' personality.  He has been chided for his work ethic even though he gets in earlier than most of his counterparts and puts in a full day.  He has been referred to in ways that were intended to irk him and raise

questions about his masculinity.  He was once told that he was "fungible."  He was also once told that management would not give him a tough med mal case.  After 11 years as an AUSA, Daves was told that a simple *pro per* prisoner case was "in line" with where he was in his development.  He was once admonished for not doing his own secretarial work. When he first started, he was called "crazy" for expressing an interest in doing Title VII cases.

76.     Other minorities have been similarly overlooked or mistreated.  Some examples:  An African-American female attorney with years of experience in the Civil Division was denied an opportunity to pursue a lateral transfer to the Civil Fraud Unit, until she complained that the open position had not been advertised.  Before her transfer out of General Civil, this African-American attorney, like Daves, had been given a caseload that consisted of approximately 40 percent *pro per* cases.  Another African-American woman who has worked for years in the Civil Division was once told by an attorney that her hairdo made her look like a slave.  A pregnant female attorney once had a male supervisor throw papers at her in anger, and she transferred out of General Civil after lodging an EEO complaint.

77.     Examples abound of more favorable treatment given to similarly situated white, male attorneys.  When two white males failed to obtain adequate litigation support from a client agency, for example, they received the full support of the U.S. Attorney in quickly remedying the problem.  Upon first joining the office, a white male attorney was put on a dual assignment with a white female supervisor.  To Daves' knowledge, no

African-American or Hispanic attorney was ever put on a dual assignment with this particular white female supervisor upon first joining the office.

78.     When a white, male attorney defaulted in a case, Daves was assigned to handle the default so that the attorney's European vacation would not be disrupted.  In contrast, when management mistakenly assumed that Daves needed coverage for a hearing in one of his *pro per* prisoner cases, they called Daves while he was overseas on vacation and ordered him back to the office to cover it.  Senior white male attorneys had no difficulty receiving assistance from junior attorneys to cover the more routine research or paralegal-type duties that arise in litigation.  A senior white male attorney was relieved of a Title VII assignment without being required, as Daves had been in comparable circumstances, to accept a case from the attorney to whom one of his numerous Title VII case was transferred.  And so on.

79.     White females have also received preferential treatment.  The white female awarded the first Civil Appellate Chief position received the opportunity without having to compete for it.  Similarly, a while female was awarded supervisory responsibilities which included editing the appellate briefs of senior attorneys without having to compete.  This same attorney was also put on a dual assignment with Chief Weidman himself.  Within two or three years of joining the office, she was recommended for and received a federal judicial appointment.  To Daves' knowledge, no African-American or Hispanic attorney, male or female, has ever had a dual assignment with Chief Weidman.

/ / /

80.    The preferential treatment given to these and other white attorneys has benefited their careers. In addition to what has already been described, several white male attorneys left General Civil to pursue career opportunities in the Criminal Division, and a number of them were subsequently promoted to supervisory positions. One was soon thereafter appointed to a federal magistrate judge position. African-American and Hispanic attorneys who have been the better part of their legal careers working in the Civil Division have not received career advancements even remotely comparable. At least two white male attorneys were, without controversy, provided secretaries who could take dictation. Daves was denied such assistance, without discussion.

## Civil Management's Secretive Decision-Making Process

81.    The Civil Division is rigidly hierarchical. Line attorneys are permitted almost no voice in the day-to-day management of the office. While line attorneys are commonly asked their views on matters of interest or importance to the DOJ nationwide, the opinions of line attorneys in the Civil Division in Los Angeles on matters specific to the Civil Division are rarely if ever solicited—as far as Daves is aware—and certainly not by the Civil Division's supervisors. Line attorneys like Daves quickly learn that they must either simply accept what their managers say, leave, or risk real retribution if they voice their objections.

82.    The line attorneys in General Civil handle a wide variety of cases, ranging from small, *pro per* slip-and-falls to large, complex, commercial matters. Daves is informed and believes that managers in the Civil Division assign a disproportionately high

FIRST AMENDED COMPLAINT

number of the smaller cases to African-Americans, Hispanics, and other minorities (except Asians). In contrast, these managers assign a disproportionately high number of the complex, high-exposure cases to white and Asian attorneys.

83. The six-person management team, with input from the Front Office, is able during their confidential sessions to strategize ways in which to position favored employees for future advancement—for instance, by awarding them special assignments through which they can improve their skills and demonstrate their mettle, or by highlighting their accomplishments to executive officials higher on the chain. Conversely, management is able to consign disfavored employees to professional obscurity—for example, by assigning them cases they cannot reasonably be expected to handle without substantial administrative or other support and then withdrawing that support, or by regularly disparaging them to higher officials. These matters are carefully calculated and not left to chance, notwithstanding management's protestations to the contrary.

84. Accountability is the cornerstone of our justice system, yet managers in the Civil Division of the Los Angeles USAO have long been able to escape it. They make critical career decisions for the line attorneys in the office with the acquiescence of, minimal interference from, or direct instruction from the Front Office. Meaningful managerial oversight from Main Justice is not apparent to line attorneys and seems non-existent.

/ / /

85.     Civil management actively manages present and prospective employees' opportunities such that its personnel decisions are effectively outcome-determinative.  The Civil managers meet each week, in private, with a representative from the Front Office, typically the First Assistant.  They assign cases.  They decide who to recruit and who to hire.  They recommend attorneys for promotions.

86.     These weekly management meetings are closed-door affairs.  They are not open to line attorneys.  Management maintains strict confidentiality not only about how it arrives at particular decisions but more fundamentally about the process by which it makes these decisions.  Because the management team is so small, even a single person's particular biases may be unduly influential.  Under these conditions, discrimination at any stage or by any member corrupts the entire team's decision.

87.     It was under these conditions that Civil management was able to manage Daves in a way that effectively prevented his opportunity for advancement, once management determined that that was the course of action it wished to take.  The supervisors, Chief Weidman in particular, simply could not see—or perhaps would not allow themselves or others to see—someone like Daves—black, openly gay, assertive on issues related to diversity and gender—representing the office in highly visible cases.  Instead, the Civil managers saved such leadership opportunities, most often tied to case assignments, for themselves or assigned them to attorneys with whom they felt a greater affinity.  Their views of Daves' abilities, insofar as they were denigrating, were closely tied to deeply ingrained race and gender biases, as were their reactions to Daves'

personality, which often contradicted their expectations of how a black man holding a subordinate position should behave—this, despite Daves' exceptional track record.

88.     Instead of using neutral criteria to make their decisions, the Civil managers have allowed themselves to be improperly influenced by stereotypes.  Acting on biases and prejudices, the Civil managers have ignored the facts about Daves' skills and accomplishments to justify decisions that thwart his development and undermine his career.

89.     Because the Civil managers could always have intervened to replace Daves on any case he might mishandle, the only potential downside to assigning Daves the more substantial, non-discrimination cases he had been requested was that he might conclusively establish himself fully capable of handling those cases, thereby eliminating any credible justification for the obstacles they wished to keep in place.

**Procedural History**

90.     DOJ has a "no tolerance" policy when it comes to discrimination, which it expresses in strong language:  "We, at the Department, are committed to providing a focused EEO program that prevents and eliminates discrimination and ensures equality in the workplace.  This is vital to our mission."  The EEO office within EOUSA is charged with ensuring that all branche offices throughout the country comply with EEO mandates.  In its mission statement, EEO emphasizes its commitment to "eradicating any discrimination that might exist in the workplace" and, to that laudable end, states outright that it "works diligently to ensure that statutory and legal requirements are met for