discrimination complaints processing, affirmative employment, reasonable accommodation, and accessibility." These mandates reflect the proposition that there is no social interest whatsoever in allowing DOJ, or any branch within DOJ, to conceal wrongdoing that perpetuates unlawful discrimination.

91.    Given EEO's mission statement, when Daves first contacted EOUSA's EEO office, he fully expected that his claims would be taken seriously and that he would receive the prompt, thorough, fair investigation that the law requires. He had this expectation, even though the mission statement was conspicuously silent on the ramifications for managers found to have engaged in discrimination conduct. Because he received substantial training in EEO policies and procedures as they pertained specifically to the DOJ and, after years of representing management in employment disputes, he had faith in the fairness of that grievance process.

92.    Daves made his initial contact with EEO on February 4, 2008. On February 7, 2008, Daves provided EEO a Pre-Complaint Form, in which he alleged disparate treatment in his work and mentoring assignments in the Civil Division of USAO. He alleged that the disparate treatment was based on his race (African-American), gender (male), age (49 at the time), sexual orientation (gay), and reprisal. On February 11, 2009, Daves forwarded to the EEO office an Addendum to his Pre-Complaint Form, in which he conveyed additional information about the event that triggered his complaint.

93.    EEO assigned Daves a counselor, who contacted Daves on February 22, 2008, to advise him of his rights. Over the course of several days, the EEO counselor

asked Daves' about his allegations.  Daves explained to the counselor, through phone calls and e-mails, to the grounds for his complaint.  In those communications, including one that occurred on February 29, 2008, Daves specifically encouraged his counselor to obtain records of case assignments directly from management, which was in a much better position to provide all statistical information.  Daves requested an office-wide examination of case assignments over a period of years in an effort to redress a pattern and practice of unlawful discrimination.

94.     When the informal counseling phase failed to resolve the matter, EEO issued on March 5, 2008 a Notice of Final Interview and Right to File a Formal Complaint.  In the Notice, EEO advised Daves that his formal complaint could contain only those issues either specifically discussed with his counselor or that were "like or related to" the issues they discussed.  On March 7, 2008, Daves' EEO counselor confirmed with Daves that the scope of his complaint would include hostile work environment and pattern and practice allegations.  On March 12, 2008, Daves notified EEO in writing that he wished to amend his complaint to include the additional issue of his being passed over for a supervisory position.  Daves received counseling on this additional issue on March 14, 2008.

95.     Daves signed and timely filed his formal complaint on March 18, 2008.  In his formal complaint, Daves checked the boxes for discrimination based on race, sex, age, sexual orientation, reprisal, and class complaint.  Daves further alleged a "continuing denial of opportunity for advancement through invidious selection of work assignments and mentoring opportunities; denial of promotion; continuing failure to take prompt,

effective remedial action for discrimination and retaliation under each of the following

theories: disparate treatment, pattern and practice, and hostile work environment."

96.    Upon accepting the formal charge, EEO at EOUSA was charged with

multiple duties and responsibilities.  For example, EEO had a duty to meet with USAO

management in order to develop a strategy for proceeding with the investigation with the

least amount of disruption, to discuss how employment records were kept, to identify

methods for producing the data needed in the investigation, and then to commence

production and data gathering at the earliest possible time.  The USAO's computer expert

should have attended that initial meeting to assist the investigator in understanding the

office's computerized records and capabilities.

97.    Yet despite being notified verbally and in writing of all issues set forth in

Daves' complaint, including allegations that Daves was presently being subjected to a

hostile work environment requiring prompt investigation and, if necessary, prompt,

effective remedial action, EEO's response was lazy and ineffective.  EEO let

approximately six full weeks pass with no investigation whatsoever.

98.    When EEO finally did contact Daves on April 29, 2008, EEO did not tell

Daves the results of an investigation, even preliminarily.  Instead, EEO merely

acknowledged receipt of Daves' formal complaint and forwarded him a copy of his

counselor's reports.  Further, EEO acknowledged not only that it had not yet begun to

investigate his complaint, but it had not yet even reviewed the charge to determine

whether it was timely or stated "a cognizable claim."  Rather than notify him of a start

date for the investigation, EEO requested additional information from Daves and gave him fifteen days to provide it if he wished to avoid a dismissal of his complaint. The fifteen-day deadline was subsequently extended to the close of business May 29, 2008.

99.    Also on April 29, 2008, EEO advised Daves that, in the event that his formal complaint was accepted for investigation, he would have a right to receive a copy of the investigative file as well as a summary of the investigation following completion of the investigation. EEO also advised Daves of his right to file a civil action in district court, if EEO failed to investigate his complaint or issue a Final Agency Decision within 180 days of the date his complaint was filed.

100.    Because he had not been afforded prompt remedial measures as late as May 2008, Daves experienced ever-escalating supervisory harassment in retaliation for his EEO activity. He reported the harassment to his EEO counselor on May 6, 2008. His EEO counselor declined to intervene, referring him to another official within EEO and wishing him well in all his "future endeavors." On May 13, 2008, Daves reported to EEO yet additional facts demonstrating further discrimination and retaliation by management. Rather than launch an investigation at that time, EEO simply directed Daves to explain the additional facts in his supplement filing, due on May 29, 2008.

101.    On May 28, 2008, Daves provided a detailed, 15-page, single-spaced summary of the facts underlying his complaints. His summary provided names, dates, and other details.

/ / /

102.   On or about June 12, 2008, EEO notified Daves that management proposed mediation.  On June 23, 2008, Daves requested further information in reference to the proposal, to which EEO responded on June 30, 2008.  Daves decided that mediation then would be premature:  no investigation had been conducted and, as a consequence, he had yet to receive any of the case-assignment information he had urged EEO to seek from management, five months earlier.

103.   Another month without any investigation.  Then, on July 23, 2008, EEO asked Daves, for the first time, the question that was preliminary to the launching of any investigation:  whether Daves wished to proceed as an individual or class complainant.  On August 1, 2008, Daves responded that he did not wish to pursue any class claims at that time but reserved his right to amend his complaint to pursue class relief if the evidence developed during the investigation warranted class relief.  Daves also clarified that he intended nevertheless to establish that his managers' unlawful conduct was not merely a series of discreet, unrelated acts but instead was part of a pattern or practice of discrimination and retaliation.

104.   Under 29 C.F.R. Sections 1614.105(d) and (e)(2), EEO was obligated to investigate the matter within 180 days after the formal complaint was filed.  EOUSA's Resource Manual incorporates this deadline:  "The investigation will be completed within 180 days of the date of the filing of the complaint."  The purpose of the 180-day limit is to ensure that administrative complaints are resolved promptly.  As became clear on July 23,

///

2008, however, EEO was still seeking clarification on issues that could easily have been clarified many months earlier, within days of the initial filing.

105.    By August 2008, management officials at EEO, or perhaps even at USAO, appeared to be intentionally stalling. Daves asked EEO to confirm that it was under a six-month deadline to complete its investigation, which had not yet begun. Daves received no response.

106.    Meanwhile, the retaliatory harassment was getting even worse. On August 8, 2008, Daves notified EEO of his desire to amend his complaint to include additional allegations of discriminatory and retaliatory harassment arising out of events that had occurred during the previous month, while Daves was awaiting the commencement of the long-overdue investigation. Daves complained that management was purposefully and effectively undermining his ability to maintain authority over and obtain assistance with his cases. A prompt investigation leading to effective remedial action could have eliminated any need to make this additional complaint.

107.    Daves also questioned whether the EEO staff could be truly impartial, seeing as they reported to the head of EOUSA, whose General Counsel was charged with defending management against Daves' complaint. On August 8, 2008, Daves requested information about the role that EOUSA's General Counsel played, if any, in the processing of Daves' complaint. Daves expressed his concern that EEO and the people who were advising the managers in the LA office how to respond to his complaint were

/ / /

also the same office and the same people who were investigating his complaint," creating a conflict of interest.

108.    Upon receiving Daves' August 8, 2008 inquiry, EEO finally assigned an investigator—AttorneyAttorney Advisor Michele L. Crawford. was given the assignment.  Crawford responded to Daves' inquiry on August 15, 2008.  Although she failed to make any reference to the issues Daves raised in his August 8, 2008 request to amend his complaint, Crawford assured Daves that the EEO Staff was committed at every step to being fair, impartial, and compliant with the letter and spirit of the EEOC's regulations and directions, and that the EEO staff had a long history of successfully meeting that commitment."

109.    On August 27, 2008, EEO issued a letter that appeared to be drafted by Crawford, who purported to be neutral.  The letter advised Daves that, after reviewing his file, EEO had decided to accept for investigation only two of the numerous issues that he had raised in his complaint and subsequent related amendments.  EEO also advised Daves that it had re-characterized those two issues, which were set forth in an attachment to the letter.  Then, after taking five months to decide which issues to accept for investigation, EEO/Crawford gave Daves only five days to respond.

110.    Daves objected to EEO's re-casting of his complaint because Title VII requires evaluation of claims from the perspective of a reasonable person in the complainant's position.  EEO's recharacertization failed to capture the nature and severity of Daves' experiences in the office.

111.    On September 2, 2008, Daves requested that his complaint be amended to include additional related allegations based on recent events in his employment. Specifically, Daves notified Crawford that management had been failing to ensure the prompt payment of his litigation expenses, had withdrawn a sizeable performance-based monetary award that was recently issued to him, and had failed to take adequate steps to fix his computer, which was crashing daily.

112.    Crawford responded on September 8, 2008 that she was "reviewing the allegations to determine whether they are appropriate for amendment." She also requested specific date-related information. Crawford thus confirmed that she was serving two functions. She was serving as the agency's investigator, charged with developing "an impartial and appropriate factual record." But she also apparently had been delegated responsibility for determining which issues would be investigated.

113.    On September 9 and 10, 2008, Daves and Crawford traded e-mails regarding the information Crawford had requested. Also on September 9th, EEO issued a second Notice transmitting an Amended Statement of Accepted Issues. The Amended Statement incorporated the issues that Daves relayed to Crawford on September 2, 2008, but it also summarily rejected, without one sentence of explanation, many of Daves' claims.

114.    On September 11, 2008, Daves communicated to Crawford all of the issues that he had raised in his initial complaint and subsequent amendments, in a way that he felt most accurately stated them. Daves even provided controlling precedent, such as

*Lyons v. England*, 307 F.3d 1092, 1107 (9th Cir. 2002), to support his request that the agency investigate, rather than peremptorily reject, outright, certain of Daves' allegations, including those pertaining to systemic violations of Title VII.

115.   The 180-day deadline for conducting the investigation expired on September 14, 2008.  No one from the government requested a written extension of the 180-day deadline, nor did Daves agree to one.

116.   On September 17, 2008, three days after the investigation deadline had expired, Crawford notified Daves that she would be taking his testimony by way of a sworn oral statement before a court reporter on October 8th and, if necessary, on October 9th as well.  She also confirmed that she was both investigating the allegations and determining which allegations to investigate.

117.   Given the scope of his allegations, Daves wanted to provide his sworn testimony in writing, not off the cuff in answers to questions from an investigator.  Under 29 C.F.R. Section 1614.108c(2), Daves was permitted to provide his testimony by way of a "written statement under penalty of perjury."  Daves proposed to provide Crawford that he provide a sworn statement in writing.  Crawford refused.

118.   On September 19, 2008, Crawford issued a Second Amended Statement of Accepted Issues.  The Second Amended Statement dismissed some of Daves' claims, which is contrary to well-established Title VII law.  Again, Crawford gave Daves only five days to respond.  This time, for no apparent reason, Crawford threatened Daves with sanctions should he "fail to cooperate" in the investigation.  When Daves requested

clarification on the particular regulation that Crawford had referenced, Crawford replied: "Please do not ask me to do your research for you.  If you do not know what MD-110 is, I suggest that you 'Google' it."

119.   On September 26, 2008, Crawford interviewed Daves by telephone. Crawford later described this interview as "immensely helpful."

120.   During her interview, Crawford displayed a lack of tact and legal acumen. One of her first questions to Daves was whether he "looked black."  She seemed unfamiliar with the facts that Daves provided in his previous statements.  She had never heard the term "*pro per* plaintiff."

121.   In a letter dated September 29, 2008, Daves answered additional questions from Crawford.  On the same day, he also provided a 16-page, single-spaced witness list detailing the information he anticipated each witness would be able to provide in the course of the investigation, a detailed response to Crawford's Second Amended Statement of Issues, and a request that Crawford take whatever steps were necessary to ensure that EOUSA place a "litigation hold" on all documents that might be deemed relevant to his complaint.  Finally, out of concerns for his reputation among peers and staff at USAO, Daves asked that Crawford keep his EEO complaint "as confidential as reasonably possible."

122.   Crawford promptly disregarded Daves' request.  She sent to each and every AUSA in the General Civil Division in Los Angeles a set of written questions, the phrasing of which made clear that Daves was the complainant.

123.    At Crawford's request, the on-site investigation was then postponed to the week of October 27, 2008.  As the time for the on-site investigation grew near, Daves provided Crawford with additional information.  On October 21, 2008, Daves sent Crawford a 44-page, single-spaced memo containing an updated and revised witness list and a list of documents that he suggested Crawford request from management.

124.    Crawford responded on the same day with a list containing 12 large categories of documents that she asked Daves to have "on hand at the time of the statement."  Daves responded immediately, explaining to Crawford that her document requests were served on short notice, making it difficult for him to respond given his work duties.  Crawford replied:  "Most Complainants have their documents ready from the time that they file their Complaints for Discrimination."  She added:  "Regarding the document request, it is entirely up to Mr. Daves what documents he would like to use to make his case.  He has the burden of proof, obviously.  If he has made multiple requests for case assignments or for things to get done, for example, he might want to include e-mail or other requests he made as exhibits to the statement.  If he does not include them, and management officials indicate that they do not recall any requests, for example, his case will not be as strong."

125.    On October 24, 2008, Daves requested that his complaint be amended to include an additional allegation based on a disparaging remark that one of his former supervisors had made to a subordinate employee about Daves' professional abilities.  Daves did not receive a response.

FIRST AMENDED COMPLAINT

126.   Daves complied as best he could with Crawford's extensive document requests.  His attorney delivered to Crawford two boxes containing hundreds, if not thousands, of pages of responsive documents.  Crawford later declined to accept the documents and demanded that they be picked up immediately.

127.   The sworn oral statement proceeded on October 27, 2008.  Under Crawford's direction, instead of a fair-minded inquiry conducted in good faith by a neutral investigator, the oral statement was tantamount to a deposition.

128.   Before the start of questioning, Crawford for the first time presented Daves with a Privacy Act waiver.  Crawford, who had traveled to Los Angeles with Deputy Counsel for EOUSA, insisted that Daves sign the waiver without providing him any information about what it was he was signing and without affording him or his counsel an opportunity to evaluate the waiver so that they could fully understand and consider what rights Daves was being asked to waive.  Crawford had had weeks to provide Daves with that waiver.  Instead, she presented it to him at the last minute.

129.   Daves was cautious.  Prior administrative findings are potentially admissible as evidence at a federal trial *de novo*, making it critical that the investigation upon which findings would be based be free of of bias.   Daves requested more specific information about the waiver, which Crawford declined to provide.  Since he didn't understand what he was signing, Daves declined to sign the waiver.  He added, however, that he remained willing to provide his sworn statement without signing the waiver.  Crawford refused.  Although Crawford's official role was supposed to be limited to that of objective fact

FIRST AMENDED COMPLAINT

finder, Crawford began listing —on the record—purported examples of Privacy Act violations that Daves had allegedly committed in his document production to her, even though she had previously denied reviewing the documents.

130.   The accusation of Privacy Act improprieties, which suggested criminal implications, confirmed that Crawford was not impartial.  She was there to protect the government.  Daves voiced his objections to continuing with the sworn statement, citing the serious questions he now had about Crawford's objectivity, neutrality, and professionalism.  Daves was under no obligation to continue with the administrative investigation, given the agency's violation of the 180-day deadline, and he certainly was under no obligation to volunteer for an ambush.  But he wanted his earnest efforts at administrative resolution not to be wasted.  So he sought a continuance of the oral statement.  His immediate interest was in retrieving and protecting the document production Crawford had rejected, which she admitted leaving at her hotel with a bell hop. The sworn oral statement -- *i.e.* deposition -- was adjourned.  Before Daves left, Crawford commented angrily, in the presence of Daves' attorney and the court reporter, "You can dish it out, but you can't take it!"

131.   Daves' counsel called Crawford minutes later and offered to come back so that Daves could walk Crawford through the documents he had produced.  Crawford declined, based on the apparent conflict created by the questions Daves had raised on the record about her ulterior motives.

///

132.   EOUSA guidelines require recusals under these circumstances. EOUSA's Resource Manual states, in pertinent part: "Complainants alleging discrimination within the EOUSA Director's Office or office of principal subordinates will be assigned for investigation by a bureau within the Department of Justice other than the EOUSA's EEO Office." In contravention of this specific guideline, EOUSA declined to transfer the investigation to another investigatory body.

133.   Even after the oral statement fell through, and even though EOUSA failed to transfer the matter, Daves continued his efforts to cooperate. He shipped part of the document production to Crawford. Crawford confirmed receiving the first box of documents Daves shipped to her. Daves the asked whether she wanted the second box of documents shipped as well. She failed to respond.

134.   On October 28, 2008, Daves requested an additional amendment to his complaint, in order to assert claims based on EOUSA's failure to conduct a prompt, thorough, and unbiased investigation. Daves also, on that date, reminded EOUSA of its obligation to preserve all records relevant to his complaint.

135.   From that point forward, Crawford ceased communicating with Daves, even though she had not recused herself and declined to have the matter transferred to another investigatory body within DOJ. On October 29, 2008, Daves provided Crawford an index for the documents that he had produced to her. He also renewed his offer, made twice previously, to walk Crawford through his documents and explain why they were relevant. Also, in another letter dated October 29, 2008, Daves provided Crawford another Revised

Counter-Statement of Issues, for purposes of clarifying what he considered to be the issues warranting investigation.. He got no response to any of these communications.

136.   On November 3, 2008, Daves asked for the list of questions that Crawford wanted Daves to answer under oath or the issues that she wanted him to address in a sworn written statement.  Crawford did not respond.  On November 4, 2008, Daves shipped by overnight mail copies of the documents that he had brought with him to the sworn statement.  On November 5, 2008, Daves asked Crawford for a copy of the notice or waiver that she had asked him to sign at the sworn statement.  Crawford declined to provide it.  On November 5, 2008, Daves also asked Crawford for information regarding the sworn written statement that she said she would need from Daves, and he specifically requested a list of questions that she wanted him to answer.  She again failed to respond.

137.   As of November 6, 2008, eight full months after Daves filed his formal complaint and nearly eight full weeks after the 180-day deadline for completing the investigation had expired, Daves' complaint had yet to be investigated.

138.   On November 6, 2008, Daves filed this action and, the very next day, apprised EOUSA of that fact.

139.   Three weeks later, on November 25, 2008, Daves requested mediation. EOUSA did not respond.

140.   Six weeks after that, on January 9, 2009, EEO recommended dismissal of Daves' administrative complaint.  Now a defendant in litigation, the USAO obtained local counsel.

FIRST AMENDED COMPLAINT

141.   On January 21, 2009, Daves provided a detailed written response to EEO's January 9 dismissal recommendation.  Also on January 21, 2009, Daves' counsel notified counsel for the USAO that he had not yet seen any evidence of document retention by the USAO.  Counsel for the USAO did not confirm that document retention efforts had been made.  Also on January 21, 2009, Daves' counsel asked for a copy of the complete record from EOUSA's EEO investigation in this matter.  Counsel for USAO did not provide the administrative record.  Finally, on January 21, 2009, Daves requested mediation.

142.   On January 29, 2009, Crawford mailed counsel for USAO "an identical copy of the file [Crawford's office] prepared and submitted to Ms. Vontell Tucker, Director, EEO Staff, Justice Management Division for the purpose of recommending the dismissal of the administrative case."  On January 30, 2009, Daves' counsel asked counsel for the USAO for a copy of the documents referenced in Crawford' letter.  Counsel for the USAO did not provide the documents.  Also on January 30, 2009, Daves' counsel renewed his request for a copy of the exhibits included with Sampson's January 9, 2009 Recommendation for Dismissal of the administrative complaint.  Counsel for the USAO did not provide the documents.

143.   Under 29 C.F.R. Section 1614.108(f), EEO was obligated to provide Daves a copy of the complete investigative file, as well as a summary of the investigation.  Daves never received those materials.

/ / /

144. On January 30, 2009, Daves' counsel reiterated his request that the government take steps to preserve any and all documents pertaining or relating to Daves' claims. Counsel for the USAO did not respond to this request either.

145. On February 6, 2009, EEO dismissed Daves' administrative complaint.

146. After EEO dismissed the administrative complaint, EOUSA agreed to Daves' proposal to mediate the dispute. The mediate took place on March 13, 2009. Neither EOUSA nor counsel for USAO provided the mediator a copy of EEO's investigative file. The government did not provide Daves with a copy of the file, so he was unable to provide a copy to the mediator. The case did not settle.

### **Retaliation**

147. Even Daves' direct supervisor has ceased engaging in regular communications, absent absolute necessity. (Daves recently learned that his direct supervisor resigned.) In fact, since Daves' filed his EEO complaint, all management-level employees have rigidly avoided all contact with Daves, absent necessity. There is a palpable chill in the air; the silence is provocative. Snubs, which often occur, are one thing; but the abject failure to communicate regarding work-related issues has made it much more difficult for Daves to perform basic job duties.

148. In addition, beginning almost immediately after Daves filed the complaint, was a noticeable increase in lingering, largely unexplained administrative and other purportedly coincidental workplace problems, the cumulative effect of which have created daily struggles for Daves. For example, the Front Office of USAO would decline to

approve litigation expenses and then neglect to inform Daves, creating a seemingly endless stream of subsequent administrative corrective measures that frequently absorbed the bulk of Daves' time and energies.  Similarly, though it was mostly non-responsive to Daves' requests for information, when the Fiscal Department would communicate with Daves, it would relay misinformation about the payment of certain litigation expenses, causing yet additional administrative hassles for him.

149.    These administrative hassles were followed by additional "mishaps," also ostensibly coincidental.  For example, Daves found himself part of a small subset of attorneys whose computers started to crash on an almost daily basis.  For weeks, he reported the problem to the computer specialist assigned to assist Civil litigators; and, for months, the problem was not corrected.  During the same period of time, Daves was given a substantial increase in the paralegal-type duties he was required to perform, after  Chief Weidman reversed a long-standing work-sharing agreement with one of the client agencies.  Daves' paralegal duties were further increased when management assigned him a slew of cases filed against an agency that management knew had limited administrative resources.

150.   Even though management had known for a number of years the types of cases Daves wanted, management intentionally avoided assigning him cases in those particular subject areas, opting instead to assign Daves only cases that were likely to go away or that Chief Weidman and the First Assistant Chief could, by virtue of their inside

/ / /

connections with the client, monitor closely.  These deceptive assignment practices have continued to the present.

151.   More specifically, within days of his initial contact with EEO, management offered Daves an affirmative multi-million dollar fire suppression case.  The offer turned out to be disingenuous, however, in that it was made on the condition that Daves agree to report directly to the man he had just named in his EEO complaint as the main discriminator—Chief Weidman.  Management naturally denied any knowledge of Daves' EEO lodging, a denial that Daves' EEO counselor belied.  In any event, Daves did not take the bait.

152.   Next, Daves was told, a few weeks later, that management wanted him to handle a big union election case, only to find out that the case would likely settle.  Around the same time period, Daves was given yet another "big" case.  This one was a quiet title action, involving allegations of art theft.  As with the union case, it was not long before Daves soon discovered what management knew upon making the assignment:  venue was improper in the Central District and the case would have to be transferred.

153.   Management kept up these false appearances for months.  A short time after Daves was given the union and art fraud cases that quietly evaporated, he received another assignment that looked promising at first, then turned out not to be.  The case was a high-profile wrongful death action.  Though falling under the rubric of medical malpractice, the case involved allegations of a drug overdose in which the alleged negligence was attributable not to complicated medical malfeasance but rather to simple nurse inattention.

Months after that, Daves was given the opportunity to litigate an affirmative environmental case, only to find out days later that a related pending criminal matter would place serious ethical constraints on his ability to conduct any actual litigation. And so on.

154. Daves was passed over for every opportunity to work with a new attorney in a dual assignment. In addition, his work received a much greater and more critical level of scrutiny than it ever had. For the first time ever, for example, his direct supervisor attended one of his summary judgment hearings, an immediate critique of which was delivered in person to Chief Weidman. When Daves' supervisor reported that the argument went particularly well, Chief Weidman retaliated further by assigning Daves another *pro per* case.

155. Since taking his employment dispute to EEO, Daves has rarely been tagged for moot courts, he has rarely been invited to lunch, and he has been specifically instructed not to contact junior attorneys directly to request litigation assistance.

156. One day, in or about late September 2008, Daves learned from a colleague that one of his former supervisors made a hateful, defamatory comment about him to a new attorney. All new attorneys have gotten the message, either explicitly or implicitly, that Daves' legal advice was not to be solicited. Consequently, none of the newer attorneys has ever sought Daves' advice. Daves has become the official office pariah, his isolation cemented by the very managers charged with identifying and ridding the federal workplace of discriminatory hostility.

157.   To draw an analogy, a "woman employed in a male-dominated workplace with an antipathy toward female workers might find her tools constantly missing, her locker broken into, and her work sabotaged." *Doe by Doe v. City of Belleville*, 119 F.3d 563 (7th Cir. 1997), *abrogated on other grounds by Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998).  Similarly, a black man employed in a white-dominated workplace with antipathy towards black men, particularly those who do not conform to traditional race or gender-based stereotypes, might find his bills left unpaid, his office space invaded, and his work and professional relationships sabotaged.

158.   After Daves complained to EEO, Daves continued to experience a host of management-generated administrative headaches that saddled him with yet additional, burdensome tasks.  In addition to the continuing problems with payment of litigation-related expenses, for example, Daves was issued a $7500 merit-based award, was assured that it was legitimate, and was encouraged by management to spend it, only to be advised weeks later (after he had already spent the money) that the Front Office had issued the award in error and was now demanding repayment.  After that, Daves learned from a Department of Homeland Security agent that the Fiscal Department had dropped one of his expert's expense file—on the floor next to a public elevator.

159.   Other attorneys may have also experienced similar mishaps, but no other attorney – except, perhaps, one as disfavored as Daves—has experienced <u>all</u> of them, and certainly not within the same concentrated period of time, following protected EEO activity.  Management's conduct had the intended effect:  it deflected attention away from

the indefensibly discriminatory assignment issues that formed the crux of Daves' complaint and it rendered Daves' overall workplace atmosphere predictably poisonous.

160.    At best, Daves' superiors either repeatedly failed to take prompt, effective remedial action to put an end to the negative events, each of which they knew about, or they themselves were responsible for causing or exacerbating the events. Such techniques, which employers, large and small, have at their disposal and which can be quite effective in corrupting an employee's ability to do his job include: discouraging or prohibiting written communications with the targeted employee, misplacing or destroying documents, corrupting computers and workstations, tampering with e-mails, disregarding requests for information, shielding information behind claims of privilege and confidentiality, attributing silence to the orders of a superior, failing to investigate complaints, withholding approvals, nitpicking work product, withholding information essential to the adequate performance of a subordinate's duties, continually imposing new or amended policies and procedures, and spreading rumors and other malicious  messages about the targeted employee.

161.    Management has used most, if not all, of these techniques against Daves, and with noticeably greater frequency after he filed his EEO complaint in February 2008.

162.    When EEO counseling failed to resolve Daves' dispute with management, Daves filed a formal complaint.  After he went formal, the EEO office of EOUSA did nothing for months.  Through its action or inaction, officials at EOUSA not only failed to

/ / /

take steps to address the hostile environment, but they contributed to and implicitly gave sanction to it.

163.   After the six-month deadline for completing the investigation expired, EEO commenced an investigation, then botched it.  To date, over one year since Daves first contacted EEO, Civil management, which has always vehemently opposed any employee-driven inquiry into its confidential assignment and other employment practices, has been made to produce not one document in response to Daves' complaint, which raises issues that span much of the fourteen-year period he has worked for USAO.

164.   As a direct consequence of EEO's mishandling of the administrative investigation -- the details of which are set forth in the "Procedural History" section that follows -- Daves has been left to speculate as to certain facts related to those management practices.  Moreover, management has failed to take even cursory steps to preserve and collect any potentially pertinent materials, let alone all of them.  Even the mediation that Daves requested went nowhere, in large part because, through management's continued legal maneuvering, the administrative file was undeveloped.

165.   Far from a mere "host of annoyances," these management-orchestrated incidents had a calamitous cumulative impact not just on Daves' ability to maintain the standards he has always set for himself but, more fundamentally, on his ability to meet the basic requirements of his job.  Daves had been forced to spend large chunks of time ironing out the multitude of problems management has caused him.  The time he has had to spend on matters extraneous to the job he was hired to perform necessarily impacted

the quality of that work.  For probably the first time in his career, as one example, Daves missed a filing deadline, prompting the Court to issue an Order to Show Cause re sanctions against the client agency.

166.   Some of Daves' present colleagues, even AUSAs who were once close to him, have started to distance themselves from him.  A number have expressed a reticence to becoming involved in the litigation, out of fear of managerial retaliation directed at them.  These friends and colleagues rarely, if ever, seek his advice anymore, never ask him to cover hearings or other court proceedings, and never even ask him to watch their cases when they go on vacation.  To some in the office, it has become almost a joke how Daves has been "frozen out" by management.

167.   The substantial time and resources that Daves has had to devote to prosecuting this matter is time he could have spent actually building a career rather than saving a job.  It is also time he could have spent simply enjoying his life.

168.   In April 2009, Daves was diagnosed as having developed acute medical problems stemming from the severe stress of his workplace.  The diagnosis required him to take an extended leave of absence.

### Exhaustion of Administrative Remedies

169.   Daves has exhausted his administrative remedies.

170.   Under 29 C.F.R. § 1614.106(e)(2) and the Resource Manual for the Executive Office of United States Attorneys ("EOUSA"), the EOUSA's Equal Employment Opportunity department ("EEO") was charged with conducting an objective,

unbiased, and thorough investigation of Daves' charges of discrimination within 180 days of his filing a formal complaint of discrimination. The 180-day deadline "represents a Congressional determination that providing prompt access to the courts in discrimination disputes is so important that the administrative process will be given only a finite time to deal alone with a given dispute." Clark v. Chasen, 619 F.2d 1330, 1334 (9th Cir. 1980).

171. EEO failed to do abide by the deadline set by Congress to complete the investigation into Daves' formal complaint. Rather than conduct a prompt, thorough investigation, EEO permitted the matter to languish in the administrative process. EOUSA did so without any reasonable justification and through no fault of Daves, who did not waive the administrative deadline or otherwise consent to an extension under 29 C.F.R. Section 1614.108(e).

172. Nor is Daves estopped from asserting EEO's non-compliance. Before and after the 180-day deadline passed, Daves cooperated fully and in good faith. He took no steps to frustrate the investigation. On the contrary, he worked diligently to prevent the investigation from being derailed or undermined. His responses to the EEO's requests were thorough, thoughtful, and timely. Daves did not impatiently abandon the administrative proceedings, jump the gun before the 180-day deadline for completing the investigation expired, and rush to the courthouse. He did not repeatedly attempt to thwart the process. Daves did not even file this action immediately after the deadline expired, though he could have.

/ / /

173.   To the contrary, Daves cooperated fully with EEO, repeatedly going above and beyond what the law required of him, in an honest effort to have his complaint finally receive the full and fair evaluation that the law requires.  Daves gave Crawford abundant information supporting his claims.  Even though Crawford had never obtained from management any of the case-related information Daves urged her to request, Daves did not inform her that she would receive the information through the discovery process after he filed his complaint in court.  He appeared for his sworn oral statement, even though he preferred to provide testimony via a written affidavit, and he asked Crawford to reconsider her subsequent refusal to proceed with the oral statement after he declined in good faith to executive at the last-minute a waiver that could have placed his private EEO statement in a public forum.

174.   Administrative exhaustion is not required were the remedies are inadequate, inefficacious, or futile, where pursuit of them would irreparably injure the plaintiff, or where the administrative proceedings themselves are void.  After the 180-day deadline passed, it became abundantly clear that Daves' multiple good-faith efforts to have the agency conduct an unbiased, thorough investigation were misdirected.  EEO subsequently failed to transfer the matter to another investigative body, in blatant derogation of its own internal regulations.  Yet, Daves still tried to resolve the matter successfully by mediation and conciliation.  He did everything he could reasonably be expected to do.

175.   Under these circumstances, Daves was well within his rights to file this civil action when he did. *See* 42 U.S.C. Section 2000e-16c; 29 C.F.R. Sections 1614.407(a) &

FIRST AMENDED COMPLAINT

(b); *see also Wilson v. Pena*, 79 F.3d 154, 166 (D.C. Cir. 1996).  EOUSA expressly acknowledged that Daves exhausted his administrative remedies when it finally dismissed his complaint.

176.   After filing his initial EEO charge, Daves made several requests to amend his charge.  As set forth herein, those amendments were based on subsequent conduct that was reasonably related to the conduct in the initial charge; in that the conduct alleged fell within the reasonably expected scope of the investigation, it alleged retaliation, or it alleged further incidents of discrimination carried out in precisely the same or closely similar manner as alleged in the initial charge.

177.   To the extent that the exhaustion requirement was not met with respect to any particular claim, although Daves makes no concession on this point, the exhaustion requirement was satisfied by principles of equity, such as waiver, estoppel, unclean hands, and tolling, as set forth herein.

### The discovery rule and other equitable doctrines

178.   That this complaint encompasses unlawful discreet acts that pre-date the January 31, 2008 meeting by a period exceeding 45 days does not render those events untimely.  Federal regulations require aggrieved persons to take action only when they actually "believe they have been discriminated against . . . ." 29 C.F.R. Section 1614.105(a).  They do not require prophylactic EEO filings, taken just in case an unwanted, adverse, or unwarranted employment action might be due to unlawful discrimination.  Indeed, if the language of this section is to be strictly construed, to

contact an EEO counselor in the absence of an actual belief that Title VII has been violated, simply for purposes of preventing a future timeliness objection, would arguably be to bring a charge in bad faith.

179.   Moreover, under the statute itself, the time period for filing charged based on discreet acts does not necessarily begin to run when the injury occurs. It more appropriately begins to run when the injury reasonably should have been discovered, and "injury" under Title VII means discrimination that the statute proscribes. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 155 n.7, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

180.   Experienced federal managers intent on discriminating are not likely to be careless when it comes to concealing their invidious motives.  They know not to make inappropriate comments or jokes in suspiciously close proximity to the taking of an adverse employment action.  Their motives are more commonly revealed over a long period of time, during those rare moments when they let their guard down, lose their professional reserve, and speak freely.  This is especially true of lawyers, like those in charge of the Civil Division, who have for decades made their living defending employers against charges of discrimination.

181.   Daves reported and answered to this incredibly circumspect group of experienced managers, who systematically engaged in a string of unlawful employment practices.  From early in his career, Daves' EEO activities red-flagged to his supervisors that he was a potential, if not likely, EEO complainant and that they needed to be careful

around him.  Through the years, they each made questionable statements, some even inflammatory.  But, for the most part, they were extremely guarded and careful not to reveal their true intentions to Daves.

182.  Consequently, Daves might have been aware that he was being treated differently from most of his colleagues.  He might even have felt that the treatment was unfair.  But at no time before January 31, 2008 did he ascribe the unfair difference in treatment to unlawful discrimination, nor would it have been reasonable for him to have done so.  Unlike his similarly situated white colleagues, he had no mentor to guide him through any of what was happening to him, in large part because of USAO's long history of discrimination.

183.  Nor should Daves have leapt to the conclusion that he was being discriminated against, or assumed it.  From years of defending employers in the Title VII cases, Daves knew enough to test his own assumptions and speculations as to managerial motives.  Hunches or suspicions do not equate to true discrimination, and believing that they do is foolhardy as a personal matter and destructive as a practice matter.

184.  Moreover, Daves was not predisposed—largely because of his training and expertise in defending employers against claims of discrimination—to blame every negative personnel decision on unlawful discrimination.

185.  Broad managerial discretion in employment practices, such as the system by which cases are assigned, is not itself discriminatory.  Setbacks and difficulties in employment are commonplace and did not equate necessarily to discrimination.  Hyper-

sensitive employees who subjectively but wrongly believe they are being discriminated against quickly lose the confidence of their employers and peers and often end up creating their own inevitable wave of bad luck. Daves understood this, all too well. Without strong evidence that the treatment he was receiving had a nexus to racism, sexism, or retaliatory animus, Daves would not have arrived at the belief, nor should he have, that his own experiences were the result of conduct that Title VII prohibited.

186. Title VII recognizes discriminatory nature of a particular discreet personnel action, such as a denied promotion, may only become apparent in light of subsequent acts if, as happened here, the employer follows a covert practice of discrimination. Discrimination in sophisticated, contemporary workplaces is often exceedingly difficult to measure. It frequently takes a persistent pattern of conduct and other telltale signs to reveal unlawful, subterranean motives.

187. At each stage, Daves' supervisors presented ostensibly valid, non-discriminatory reasons for the disparate treatment he identified, even with respect to the denied promotion in 2006, and for years Daves credited that they were acting in good faith. It would have been wholly unreasonable for Daves, particularly given his Title VII background, to jump to the conclusion, absent compelling evidence, that management's express reasons for the disparate treatment were insincere covers for discrimination. And he did not do so. Out of respect for his supervisors, Daves took care *not* to act until he reasonably believed that he was being treated differently *because of* unlawful managerial conduct proscribed by Title VII. As late as November and December 2007, in fact, Daves

demonstrated the belief and trust he placed in his managers by continuing to confide in both his direct supervisor and Chief Weidman about his professional concerns.

188.   Chief Weidman's wholly disingenuous, self-contradictory, trumped up rational for denying Daves the cases he had long been requesting was the event that triggered Daves' subjective belief that he was being discriminated against because of his race, gender and EEO participation.  Further, it gave Daves sufficient reason to attribute management's collective actions to unlawful discrimination.  Not long after Daves filed his complaint in February 2008, he made sure that the pre-filing period events would be included for investigation.  On June 2, 2008, Daves requested relief under 29 C.F.R. Section 1614.105, which *required* the agency to extend the 45-day time limit for any and all actions of which he did not know or have reason to know the discriminatory nature.

189.   In any event, even if some of Daves' claims are time-barred, the filing of a timely charge is a requirement that is subject to waiver, estoppel, and equitable tolling. By accepting Daves' charge for investigation, EEO waived any objections to technical defects in the charge.  More importantly, any delay in Daves' discovery of the discrimination was not due to a lack of diligent inquiry on his part.  Management's aggressive, proactive steps to erect an impenetrable wall of privacy and confidentiality around its assignment and other personnel practices effectively shielded from discovery their unlawful nature.  An employer who, through the affirmative use of covert acts and deception, effectively avoids the detection of its unlawful conduct and thereby prevents

/ / /

the timely filing of a complaint is estopped from asserting lack of timeliness as an affirmative defense.

190.   Finally, management explicitly conditioned favorable performance ratings on the extent to which employees placed the office's interests and needs over their own, which had the intended effect of discouraging complaints.  Management engaged in additional practices that discouraged the exercise of employment rights.  Under these circumstances, the limitations period should be equitably tolled in favor of Daves who could not otherwise resurrect any untimely claims.

**FIRST CAUSE OF ACTION:**

**DISPARATE TREATMENT BASED**

**ON RACE, GENDER AND EEO ACTIVITY**

191.   Paragraphs 1 to 190 are incorporated here by reference.

192.   Thirty-seven years after Congress passed the Equal Employment Opportunity Act ("EEOA"), bringing federal employees within the rubric of Title VII because of the government's "abysmal record in minority employment," the process of rooting out discrimination in federal agencies is far from over.  For thirteen years, in the Civil Division of the USAO in Los Angeles, the managers responsible for running the office hired only one African-American male attorney:  Daves.  It wasn't until the year 2008 that Civil management hired a second African-American male, and it did so in large part because it anticipated the charge of employment discrimination that eventually gave rise to this action.

193.   In terms of management-level opportunities in the Civil Division, the USAO has yet to break the color barrier:  all Civil managers are Caucasian.

194.   Consistent with its historically exclusionary hiring and promotion practices, USAO management has subjected Daves to roadblocks that no other attorney in the office has experienced.  He was singled out early in his career and has been treated, ever since the Civil supervisors were given the go-ahead, markedly less favorably than others similarly situated on account of race, gender and EEO activity.  The policy or pattern of discrimination constitutes its own violation.  It is also proof of management's intent to discriminate and the falsity of management's asserted justification for its continuing discriminatory conduct.

195.   At the time of his hiring in 1995, Daves was only the second African-American man to work in General Civil.  Upon hiring Daves, Civil management immediately and purposefully designated him a "Title VII lawyer."  Daves agreed to concentrate in that area, initially, never suspecting he would be permanently restricted to those cases and thought of only as a "Title VII lawyer."

196.   Over the ensuing years, the temporary arrangement turned into perpetual *de jure* segregation, effected through the continuing application of egregious employment practices driven not by carefully studied individual assessment but by stubborn, irrational prejudice -- the opposite of a meritocracy.  If Title VII was once a way to pay dues as a junior AUSA, for Daves who now has nearly twenty years of litigation experience under his belt, paying dues has become the hallmark of his working life.

197.   When Daves first expressed an interest in broadening his practice area, he was ignored.  When he started pursuing it, he was punished.  Civil management became proactive in creating a *post hoc* justification for denying Daves equal opportunity.  Defying the EEAO, which charges federal employers to guard against even the appearance of unfairness and inequality in the federal workplace, management made "ill use" of the authority with which the law entrusted it.  Management engaged in a long, odious pattern and practice of improperly controlling and diminishing Daves' once promising career prospects through the undue restriction of numerous critical employment opportunities that would have helped him prepare for advancement.  The game was, thus, rigged.

198.   Anti-discrimination laws like Title VII are all about ensuring access to places where doors have traditionally been shut and locked.  Daves was hired.  But, the doors of further opportunity were promptly and permanently closed once he entered.

199.   In furtherance of its unlawful segregation scheme, Civil management at USAO  historically and consistently assigned Daves, pursuant to a highly subjective and secretive selection process, the least desirable, least prestigious, most arduous (and often most emotion-laden) cases, the present discriminatory effects of which Daves still feels.  With rare exception, plum assignments have been reserved for Caucasian and Asian attorneys, with a disproportionate number going to white males, most of whom have now surpassed Daves in terms of litigation experience and accomplishments -- a set back that is irreversible.

FIRST AMENDED COMPLAINT

200. Daves' inferior assignments were not sporadic or discreet acts but rather part of a routine, regular practice or policy the continued application by which currently treats similarly situated employees differently to this day.

201. In situations where attorneys have comparable education, seniority, and work appraisals, the fact that some have gotten more complex and varied cases gives them a considerable advantage and may weigh crucially in determining who ultimately is deemed better qualified for advancement. This is particular true where, as here, serious questions of impermissible bias exist among decisionmakers who have consistently exhibited a tendency to like or dislike employees based on mental associations between a social group and certain traits, favorable or unfavorable.

202. The biased managers in charge of the Civil Division have acted for years with unbridled discretion to make subjective employment decisions, believing that they would never be held accountable for the criteria used, if any, to make most of their personnel decisions, for the accuracy of the information upon which their decisions are based, or for the consequences their actions will have for equal employment opportunity.

203. Since approximately 2002, each U.S. Attorney appointed to preside over the Central District has turned a blind eye to signs of a management culture gone awry, signs to which only they and other top managers were privy. Each U.S. Attorney since 2002 owed and denied Daves a prompt, decisive remedial response.

204. Ironically, the maintenance of strict confidentiality regarding the case assignment and promotion processes placed Daves in the untenable position of having to

vindicate rights that were violated in a way that was specifically intended to prevent him from making his case.

205.   Because of management's illicit practices, most of Daves' assignments have been in the area of Title VII, although he has also received a disproportionate number of highly taxing *pro per*, prisoner, and other comparably less desirable cases. Daves' last significant piece of non-Title VII litigation was assigned to him nearly a decade ago, when an Hispanic male was serving as U.S. Attorney for the district. Daves' last dual assignment with a junior attorney he was asked to train was well over a decade ago. Since then, the vast majority of Daves' cases, including his Title VII assignments, have been relatively simple and unchallenging, particularly for someone with his level of education, training, and experience.

206.   Success in the decidedly inferior cases to which Daves has been relegated, cases which often require "twice the effort for half the reward," carried much less weight, as far as management was concerned, than success in the superior cases Daves' colleagues received, thereby further perpetrating discriminatory work conditions.

207.   Many of Daves' cases have required, for various reasons readily foreseeable to management at the time of assignment, administrative duties above and beyond those normally attendant to Civil cases or that have required regular, extensive long-distance travel outside the Western Division to locations as divergent as Santa Ana, Riverside, San Bernardino and Victorville.

/ / /

208.   By confining Daves to less career-enhancing assignments, management has consistently denied him the opportunity to litigate cases that could have advanced his career, cases in areas routinely handled by attorneys in General Civil, such as complex medical malpractice, *Bivens*, environmental law.  Such cases constitute more prestigious, higher profile, higher exposure assignments.

209.   Civil management's pattern of conduct constitutes an affront to Title VII, because the terms and conditions of Daves' employment have been appreciably less favorable than those afforded similarly situated AUSAs.  Daves' assignments have been consistently and markedly inferior, more disadvantageous, and more burdensome in terms of scale, trial worthiness, legal and factual complexity, caliber of opposing counsel, and community importance, than those afforded many, if not most, similarly situated AUSAs, including attorneys who have had substantially less training and experience than Daves.

210.   Although Daves' salary was corrected years after he joined USAO, so as to place him on par with those similarly situated colleagues receiving substantially higher pay, the work Daves has been given through the years has not been similarly corrected.  If anything, the quality of Daves' assignments has deteriorated over the years.

211.   Civil management has also repeatedly and without substantial justification denied Daves other job opportunities and experiences, within the office, that could further his development and make him competitive for promotion and other career-enhancing opportunities.  Such opportunities have included, but have not been limited to, the areas of hiring and recruitment, mentoring junior attorneys through such means as dual

69

FIRST AMENDED COMPLAINT

assignments, and training.  These and other opportunities constituted means by which Daves could have significantly influenced workplace policies and practices.

212.   Management's discriminatory practices have rendered Daves significantly less competitive for promotion, as evidenced by the denial to Daves of a supervisory-level promotion in favor of a similarly situated white female.  The complex cases given to Daves' peers were invaluable learning experiences in and of themselves.  Working up a complex medical malpractice case could easily be, for instance, the functional equivalent of attending a two-week training seminar in that highly technical field of practice.  Therefore, the repeated failure to provide Daves the same or similar types of invaluable learning experiences that his colleagues have received, often without asking for them, amounts to an unjustifiable failure to train him in subject areas that are potentially career-enhancing.

213.   The disparate treatment to which Civil management subjected Daves did not end with the discriminatory case assignment practices.  When Daves first started engaging in protected EEO activity, and then actively pursued cases that management deemed off-limits, management, acting with the approval of the Front Office and other higher-ranking officials, singled Daves out for surreptitious paper-trailing.  While continuing to lavish praise, thereby placating Daves and raising unrealistic expectations, they secretly plotted to build a case against him.  They began secretly scrutinizing his work and subjecting him to tests of various sorts -- a fact that Daves' present supervisor subsequently confirmed.

///