214.   Although most of the time, Daves passed management's tests, management was nevertheless able, because it was operating clandestinely, to develop a record by which to create the appearance that Daves did not merit tougher assignments or advancement.

215.   While Civil management was building a preemptive strike against Daves, higher-level managers exhibited complicity, at a minimum.  Through non-action, they encouraged the very misconduct they had a responsibility to identify and remedy.

216.   Civil management also pursued actions -- which included supporting the withdrawal of much needed timely litigation support from client agencies – obviously intended to sabotage Daves' ability to maintain a high level of performance, isolate him from his colleagues, and marginalize, if not altogether prohibit, any positive contributions he might otherwise be able to make to the office.

217.   All these facts present a convincing mosaic, if not a clear acknowledgement, that the disparate treatment experienced by Daves was *because of* his race, gender and EEO activity.  Once Daves started expressing a desire to expand his knowledge base and take on more challenging assignments, all his supervisors had to do was treat Daves like an equal.  This, they simply could not bring themselves to do.

218.   Chief Weidman conducted the January 31, 2008 verbal counseling, not with appropriate dispassion and professionalism, but as though he had a huge personal stake in the outcome.  He did not act honestly, to the best of his judgment; he acted dishonestly, against his better judgment.  Chief Weidman and his managers, at the direction or with the

knowledge and concurrence of the Front Office, General Counsel for EOUSA, and Human Resources officials, rendered an employment decision based on information that Chief Weidman admitted to having intentionally and admittedly concealed from Daves. To this day, Chief Weidman has continued to withhold the information.

219.   The information regarding the numerous prior complaints, if true, was important not only to Daves' development as a litigator but also, more fundamentally, to his position as an employee of USAO and, under management's general duty of candor, should have been shared with him as soon as each complaint was lodged.

220.   By collecting damaging facts pertaining or relating to Daves' employment, without giving Daves an opportunity to respond to any of those facts, Chief Weidman was setting the stage and laying a foundation for future disciplinary action, including termination if possible, and manufacturing a defense that management could use, if necessary, in future litigation -- a skillful form of employment sabotage.

221.   Equally suspicious was the timing of the previously unrevealed complaints forming the basis of an adverse action taken within days of the official "highly successful" performance appraisal.

222.   Civil management applied inconsistently standards when it came to evaluating attorneys and, in addition, maintained two systems of AUSA monitoring – one for disfavored employees like Daves and one for favored employees, *i.e.*, persons who reflected management's values or who fit traditional or preferred racial or gender-based codes of conduct.  Such covert, disparate, outcome-determinative monitoring or tracking

is not accidental but highly suspect, in that disfavored employees accumulated more complaints and other negative notices than favored employees, whose disagreements or problems go unnoticed or unrecorded.

223.   Further evidence of Civil management's disregard for Title VII lay in the stated reasons Weidman gave Daves on January 31, 2008 to support his decision to deny him the types of cases he had long requested. Chief Weidman was a seasoned professional who knew exactly what he was doing, having headed the largest Civil Division in the nation for close to two decades.

224.   Chief Weidman knew how to craft an effective strategy for managing disfavored employees such as Daves; in fact, for years, he had succeeded in placating Daves with false praise and empty promises, while effectively pulling off stealth discriminatory practices.  Weidman even admitted to Daves, before the meeting, that he needed to spend time carefully consulting "HR" in devising a strategy by which the particular meeting would be conducted.  Yet, the reasons Weidman provided in support of management's decision had no basis in fact, were so self-contradictory as to be totally unworthy of credence, and did not actually motivate the decision.

225.   Daves was qualified for the assignments he wanted before January 31, 2008; yet, he never received them.  Daves' performance had been consistently outstanding, as his performance reviews indicated.  In fact, those outstanding appraisals, together with Weidman's repeated representations, reasonably raised Daves' expectations about receiving the desired assignments.

226.   The "questionable professionalism" charge voiced by management a few days before the January 31, 2008 meeting could not be squared with those reviews and promises.  Tellingly, the professionalism charge – which arose coincidentally in the context of Daves' reporting duties under the canons of ethics and thus had a chilling effect on the exercise of Daves' rights -- was not even referenced in the January 31 meeting.

227.   Chief Weidman blindsided Daves with the charge of "multiple complaints," just as he had blindsided him the prior year with news of multiple complaints allegedly made while Daves was on vacation overseas.  Further, even though Chief Weidman used "communication problems" exhibited in the context of a Title VII case as the justification for denying Daves significant non-Title VII cases, he did not discontinue assigning Daves Title VII cases.  It is clear that Weidman's patently false explanation simply codified a decision management had made long before any of the events giving rise to the charges came to pass.

228.   Adroitly avoiding the appearance of bad manners, Civil management has masked their discriminatory conduct with surface collegiality.  Management has openly praised Daves' work, repeating to him and to others in the office their unequivocal vows of support.  While making an empty show of support for Daves, however, Civil management has at the same time taken actions that exhibit a continuing disrespect for Title VII's mandates.

229.   For example, behind Daves' back, management made inappropriately defamatory comments about him to subordinate employees.  Management disseminated a

FIRST AMENDED COMPLAINT

gratuitously negative employment reference to a judicial appointments committee member. Management orchestrated a series of pranks mostly in the form of ostensibly innocent administrative mishaps, in an effort quietly to undermine Daves' overall effectiveness as a litigator.

230. Additional examples of deceptive, undermining practices abound: the purportedly lost a court order, which resulted in the unnecessary disruption of Daves' overseas vacation, the secret switching Daves' office assignment with that of a new attorney during the office move, the admittedly unsubstantiated charges of misconduct, the placing of Daves on probation for unproven and unspecified performance deficiencies, the refusal to award Daves dual assignments, and so on.

231. Management's unlawful efforts to conceal its historically discriminatory conduct have also included shrewd techniques of image control. USAO and EOUSA have published website photos of themselves, issued strategic plans and internal memoranda on ethical issues, conducted a multitude of EEO training seminars, held mandatory office-wide meetings covering topics pertinent to issues raised in this action, such managements' duties under the Prompt Pay and Freedom of Information Acts, and issued a stream of self-congratulatory e-mails listing their own accomplishments as well as those of attorneys they wish to promote.

232. At that same time that Civil management has engaged in calculated image bolstering, it has endeavored to ruin Daves' reputation. By robbing Daves of any meaningful opportunity to work with or assist his colleagues, and then making comments

that effectively defame behind his back, Daves' supervisors have cast Daves as a pariah -- the perpetual malcontent, undeserving of significant assignments and, in fact, potentially dangerous as a role model for newer attorneys.

233.   If much of management's lack of support for Daves did not stem from the dyed-in-the-wool racism or sexism of decades past, there can be no doubt that it nevertheless stemmed from unlawful discriminatory motives.  Generally well-meaning people who outwardly support racial and gender equality in the workplace can nevertheless have great difficult seeing certain minorities as sufficiently capable of rising through the ranks and competently handling complex, high-level legal matters.  Such aversive racism or sexism is prevalent in modern workforces such as USAO, because many, if not most, persons in positions of power do not necessarily see their conscious choices as stemming from any hidden or unconscious agenda tainted with impermissible bias.

234.   Therefore, even though the direct or indirect evidence of discrimination may not  consist of blatantly obvious signs, such as the frequent use of offensive racial or gender epithets, it exists in most subtle but no less harmful forms, revealed by the striking confluence of such multiple factors as:  the display of doubts and fears about Daves that were not exhibited about his white male and female counterparts, the multiple incidents of suspicious timing, the numerous revealing statements, and the often starkly superior treatment Daves' similarly situated colleagues have received or would in comparable

/ / /

FIRST AMENDED COMPLAINT

circumstances have received. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-82 (3d Cir. 1996).

235.   The disparate treatment to which Daves was subjected was not supported by legitimate, non-discriminatory reasons, and any and all reasons proffered by management to date were pre-textual.  Title VII does not excuse the offending disparate treatment, even if it can be shown that similarly situated African-American female attorneys or other male attorneys who challenge traditional gender norms were also treated more favorably than Daves, in material respects.  First, not all of those attorneys expressed a desire to litigate the types of cases that Daves wished to litigate.  Second, the USAO has consistently treated similarly situated most attorneys outside Daves' combined protected classes more favorably, suggesting a heightened level of distrust or fear of Daves' particular combination of immutable attributes.

236.   Third, Title VII does not, in any event, require that *all* other members within the plaintiff's class be similarly or comparably mistreated for a violation to be firmly established.  Fourth, as part of its strategy to build a case against Daves, particularly after he first complained to DOJ auditors about workplace disparities, one more African-American male was hired and one or more African-American attorneys started receiving the types of cases Daves that has been denied; however, the subsequent curative measures taken by management in order to hide its long history of unlawful employment discrimination do not tend to prove that the prior violations did not occur, particularly

/ / /

when the managers taking those measures are the very ones who historically committed the most obvious or egregious violations.

237.   The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular adverse action or collection of adverse actions at issue. Moreover, the retaliation that Daves sustained had discriminatory aspects, in that management responded better to while males who complained of disparate treatment in their case assignments.  For this reason, although any attempt to separate Daves' identity at the intersections of race, gender, and EEO participation could distort or ignore the particular nature of his experience, Daves also asserts separate claims based on each impermissible factor, as well as claims based on the combination of impermissible factors, as well as a disparate treatment claim specifically based on facts supporting his retaliation claim, which is set forth below.

238.   As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

/ / /

/ / /

## SECOND CAUSE OF ACTION:

## HOSTILE WORK ENVIRONMENT BASED ON

## RACE, GENDER, AND RETALIATION FOR EEO PARTICIPATION

239.  Paragraphs 1 to 238 are incorporated here by reference.

240.  A reasonable African-American man would easily find that the discriminatory atmosphere that has long characterized Daves' workplace sufficiently polluted his experience, even before the day Daves subjectively identified the racial, gender, and retaliatory animus underlying it.  By making it much more difficult for Daves to do his job, take pride in his work, and desire to stay on in his position, management effected an additional violation of Title VII.  The segregationist employment practices used by USAO management turned Daves' work environment into a type of apartheid. The covert nature of those practices does not immunize USAO from responsibility.  Title VII provides no safe harbor for any race, gender or retaliation abuse, regardless of how crafty or subtle the delivery.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

241.  Daves has not merely been shunned.  The prevalence of disparities evocative of racial and gender-based hierarchies were significant exacerbating factors in terms of the severity of the workplace hostility.  The employment barriers and restrictions that were set in place years ago because of Daves' failure to meet certain stereotyped race and gender-based expectations had the intended effect of isolating Daves to such a degree that the discriminatory insult permeated virtually all aspects of his workplace.

FIRST AMENDED COMPLAINT

242.   To subject Daves to a persistent pattern of unspoken sabotage in order to raise serious questions about his intelligence or competency was to shackle him at the ankles; the very fact that management raised false questions was damage enough, in this society.  The same was true for persistently negative baseless actions designed to raise questions about Daves' masculinity, strength, or readiness for "hard-ball" litigation.

243.   Daves was a senior litigator with outstanding credentials and solid experience who proved his mettle for USAO time and again.  He won the vast majority of his cases by motion and never shrunk away from an important, winnable fight.  He did not deserve to be blacklisted for raising a legitimate challenge to management's limited view of where he properly fit in.  Yet, for years, without any valid justification, and unlike anyone else in the office, Daves was relegated to litigating mostly nuisance cases brought by unrepresented prisoners, when he wasn't defending yet another federal agency against discrimination charges.

244.   At the same time, management's contemptuously preemptive conduct rendered Daves helpless to challenge its persistently unlawful practices.  Given his immutable traits, Daves was naturally conspicuous, making it virtually impossible for him to maintain even an appearance of dignity in the face of the subservient role he has been forced to play.

245.   Many of Daves' contemporaries have become, through the assistance of the very managers who have targeted Daves for mistreatment, supervisors within the office or judges outside the office.  For Daves, coming to work was tantamount to riding "the back

of the bus" day in and day out.  Conditions that white attorneys would never be expected to tolerate for even one day, Daves were expected to take for granted -- the price he had to pay for the privilege of working at USAO.

246.   Although management coupled its discriminatory case assignment practices and other manipulations with additional insulting conduct and comments (many hardly subtle) intended to demoralize Daves, no further insult was necessary for material, lasting damage to be done.  Daves' white supervisors, who were rarely victims of racial assault, may have viewed their collective actions in a vacuum without a full appreciation of how Daves, given his experiences in life, perceived them.  They may have thought that they actions and comments were innocent or only mildly offensive.

247.   But, in reality, to Daves the actions were intolerably threatening not just to his long-range career aspirations but to his basic concepts of job security and livelihood. "The omnipresence of race-based attitudes and experiences in the lives of black Americans [may cause] even nonviolent events to be interpreted as degrading, threatening, and offensive." *Harris v. Int'l Paper Co.*, 765 F.Supp. 1509, 1516 (D.Me. 1991).  The same can be said for the offensive conditions that exemplified gender-based animus emanating from management's view that Daves failed to exhibit sufficient attributes stereotypically associated with his gender.

248.   Submission to the unwelcome subservient role in General Civil was made an explicit term or condition of Daves' employment, the moment Weidman told Daves on January 31, 2008 that he was further justified in denying him the cases he wanted because

he had hired him as a "Title VII lawyer." For any employee to discover that for years he has been "played a fool" is humiliating. For a black man who has struggled for the better part of a decade to establish credibility and respect in a nearly all-white workplace to make that discovery is beyond humiliating.

249. As oppressive as his work conditions had become long before Daves filed his EEO complaint, they grew much worse once Daves took action to expose the discriminatory animus animating those conditions. The lodging of Daves' EEO complaint on February 4, 2008 was promptly communicated to Daves' supervisors, causing them to react not with the genuine concern one might expect from people who have been misunderstood but with the predictable defensiveness of the truly culpable.

250. Daves' supervisors, including upper-level Front Office officials as well as officials at the Office of General Counsel, Human Resources, and EOUSA, were responsible for responding to Daves' complaints, and subsequent amendments, and were thus kept apprised of them as they were filed. When Daves specifically named them as discriminators and retaliators, the managers from these entities, each of whom had a personal interest in the outcome of the process, cooperated with each other to devise and implement a strategy for defeating Daves' complaint.

251. As for Daves' supervisors in Civil, they were no longer able or willing to conceal their antipathy and contempt behind common workplace courtesies. The pre-existing, veiled hostility rose to the surface, in close and suspicious temporary proximity to Daves' opposition practice. From that point on, Daves experienced mistreatment

stemming from an imbalance of power and a capitalizing on that imbalance at Daves' expense, fostering a sense of degradation in Daves.

252.   The post-complaint hostility, which systematically and continuously deprived Daves of the right to participate in the workplace on equal footing with other AUSAs, did not stop at open snubs and discourtesies.  It devolved into a steadfast and continual failure to engage in good-faith interactions regarding Daves' case-related requests and complaint-related inquiries.  It then escalated to outright vengeance, the point where even the EEO office of EOUSA, which was charged with investigating Daves' complaint, responded not just combatively but spiteful, lashing out at him with statements only the most amateur of litigation adversaries would make, statements like "you can dish it out, but you can't take it!"

253.   In discrimination cases, the ultimate question is one that can only be resolved through a searching inquiry based on a full record.  A full record becomes critical when the allegations involve employment decisions that are made by a group.  Collegiality and personal relationships are often significant driving factors behind such decisions, and those issues are particularly difficult to evaluate since a complex of motives may exist. USAO and EOUSA management were well aware of these facts.

254.   With full knowledge of the benefits of stonewalling, therefore, management of USAO and EOUSA sought to prevent the development of such a record.  And they succeeded.  Over a year after Daves filed his original complaint, despite reams of detailed materials produced by Daves, there is still no administrative record.  Because Daves had a

right to have his complaints investigated diligently and thoroughly, the further covert maneuvering that denied him an investigation was destructively punitive.  These calculated actions materially and negatively altered the terms and conditions of Daves' employment, such that Daves was made to endure a level of hostility that he reasonably found to be both severe and pervasive.

255.   USAO managerial practices, especially those specifically used in the Civil Division, disrupted Daves' work environment and created administrative trouble for him.  The practices that amounted to unabashed harassment included such acts as:  misleading EEO staff by, among other things, denying any nexus between the lodging of Daves' EEO complaint and the offering to him of the fire suppression case; requiring Daves to perform work typically delegated to agency counsel and paralegals; and telegraphing managerial displeasure and lack of confidence in Daves; and disparaging Daves' work to subordinate employees.

256.   The harassment was further effected by escalating, day-to-day jabs that were thrown his way, in the form of administrative-type pranks and mishaps that were sufficiently serious to present real, time-consuming and energy-draining annoyances but that could easily be explained away as "innocent" mishaps or mistakes, hence artificially bolstering management's defense.  Examples of the pranks were:  the purportedly inadvertent placement of an expert file near a public elevator, the disproportionately frequent administrative mistakes pertaining to litigation expenses, the purportedly erroneous issuance and subsequent withdrawal of a sizeable cash award, and the

consistent failure to address and correct an easily correctable, highly disruptive computer "glitch" on Daves' computer system that "coincidentally" surfaced soon after Daves' filed his complaint.

257. The post-complaint harassment -- none of which occurred when Daves stuck to the Title VII his managers were willing to give him -- also included: erecting expertly crafted artificial barriers to Daves' ability to prove harassment by deeming certain issues "confidential" or "secretive" matters implicating possible statutory violations and about which, consequently, any and all internal communications were privileged; embroiling Daves, more than nearly every other AUSA, in an after-the-fact ratification process for expert and vendor bills, turning a process that had previously taken days to complete into one taking weeks if not months to complete; creating the sham appearance of accommodation to Daves' case assignment requests, for purposes of sheer litigation posturing; demonstrating bad faith in connection with the mediation requested by Daves by, among other things, withholding critical information from the mediator; and, rather than acquiesce to Daves' requests in any meaningful way, generally doing whatever it took to manufacture litigation defenses against him (such as the classic "paranoid plaintiff" defense), veil management's unlawful conduct, thwart legitimate inquiries into management's decision-making, and maintain and fortify Civil management's ultimate, unchecked discriminatory control over the workplace.

258. Adroitly avoiding the appearance of bad manners, management masked their nefarious conduct with surface collegiality, continuing their open praise of Daves' work

and repeating to him and to others in the office their unequivocal vows of support.  The effect of management's duplicity, which was its own separate form of harassment, made it extremely difficult, if not impossible, for anyone outside the management chain to discern the true underlying motives.

259.   That management's antipathy was mostly covert and subtle, as opposed to overt and direct, made the work environment that Daves endured no less oppressive than it would have been had Daves been subjected to a daily overt barrage of racial and gender-based epithets.  Through years of planned and rehearsed dishonesty, management was able skillfully to confine Daves to a subordinate, demeaning status bearing no relation to his education, training, work record, or commitment to the office.  Endeavoring to take his career from him was management's way of saying to Daves "get out."

260.   In further derogation of the EEOA, the legislative history of which highlighted Congress's discontent with agency procedures for handling complaints of employment discrimination, EEO, which throughout the processing of Daves' complaint maintained direct contact with the Office of General Counsel for EOUSA, in fact, shed any pretense of impartiality.  Rather than comply with its own mission statement and investigate local management at the USAO, or even set an early meeting that same month or in April, at the latest, to lay a tone of urgency on the investigation, the EEO office of EOUSA joined forces with USAO management to build a defense.  Together, they worked skillfully to advance the joint litigation strategy and, in the process, sacrificed any pretense at objectivity or neutrality.  These management units shared a common purpose:

to unreasonably delay and ultimately rebut and disprove Daves' claims and to erect a series of artificial, nearly insurmountable barriers to Daves' pursuit of relief, all for the underlying purpose of avoiding liability and protecting DOJ, their umbrella agency.

261.   Even though Daves' complaint included harassment claims, EEO delayed assigning an investigator, not for a period of days or weeks, but for a period of several months. In fact, EEO dropped the ball completely, waiting until the eleventh hour to assign an investigator; when it got around to this essential, preliminary function, the deadline for completing the investigation was upon it.   Under the controlling regulations, the period of investigation must cover as much time as necessary to obtain sufficient comparative or historical evidence to make findings on the merits.   Data on employment practices may be needed for periods preceding the remedial relief period in order to demonstrate the extent of violations and fashion appropriate remedies.   By delaying the start of the investigation until the tail end of the statutory deadline for completing it, therefore, EOUSA created its own emergency, which they then used as a basis for declining to proceed with diligence and thoroughness.

262.   To make matters worse, from the moment she was first assigned to the case, EOUSA/EEO Attorney Advisor Crawford, was unprofessional and openly adversarial towards Daves.   The EEO investigator typically makes a significant contribution to the resolution of a complaint.   The investigator is not an advocate for either side.   The investigator's behavior, demeanor, and attitude reflect on EOUSA, and naturally impact the parties' willingness to cooperate with the investigation.   Yet, EEO gave Crawford the

task of deciding which claims of Daves' claims to investigate and which to dismiss. Crawford, whose purportedly neutral role should have been confined to investigating the accepted charges, proceeded to decide for herself which claims to accept and which to drop. Moreover, the claims she sought to dismiss were perfectly viable, as a matter of law.

263. The manner in which Crawford conducted the investigation was itself harassing and entirely inconsistent with well established policies and procedures. At virtually every stage, Crawford ran afoul of elemental policies, procedures and practices governing EEO investigations. She neglected to describe the observable, documentary, testimonial, and statistical evidence required and the best sources and means of obtaining each. She neglected to prepare a statement of likely or enunciated respondent defenses and the evidence required to test their validity. She refused to prepare and serve on *all* parties requests for information that were specific and adequately tailored to the scope of the investigation. She refused to accept a sworn written statement, which Daves offered to provide. From the start, Crawford exhibited skepticism, impatience, hostility, and outright bias. During her introductory phone call to Daves, in fact, one of Crawford first questions to him was whether he "looked black."

264. The myriad additional hostile acts taken during the purported investigation of Daves' complaint are set forth in the Summary of Facts and are incorporated by reference. Among them were: the repeated failure promptly to investigate Daves' allegations of ongoing and continuing harassment; the repeated stonewalling, even after EEO's failure

to meet the six-month deadline for conducting an investigation; the intentional delay in deciding which issues to investigate; the knowing refusal, without legal justification, to accept for investigation issues that were viable; the refusal to  accept of a sworn written statement; the gratuitous and reputation-damaging disclosure of Daves' identity as an EEO complainant to all of his colleagues in the Civil Division; the failure to draft and serve interrogatories that might have elicited useful, potentially relevant and admissible information; the forcing of Daves to provide a sworn oral testimony, for no good reason; the serving on Daves a lengthy document request less than one week before his scheduled sworn oral statement; the refusal to accept the documents that Daves produced; the pressuring of Daves to sign a Privacy Act waiver, without proper, advance notice; and the criticizing of Daves for producing irrelevant documents while declining his offer of proof as to their relevance.   Conduct such as that displayed by EOUSA's EEO staff exemplified the built-in conflict-of interest, which Congress acknowledged when it passed the EEOA, that exists when a federal agency is "almost entirely responsible for investigation itself."

265.   Although Civil management had no supervisory authority over EOUSA's EEO unit, they had both the ability and the affirmative duty to remedy the adverse actions to which EEO subjected Daves.  Yet, even though they were or should have been fully aware of what was happening, Daves' managers declined to intervene and offer him any remedial action.  They benefited from Crawford's misconduct and did nothing about it. Presumably, they would have voluntarily produced records and other evidence establishing an absence of discriminatory or retaliatory intent, if such evidence existed.  If

they did not actually plot with EEO the course of action taken, it was their complicity alone that offended Title VII.

266.   The humiliation and abuse to which Daves was continually subjected were unlawfully based on his race, gender, and EEO participation.  Notably, Civil management's actions have consisted evinced an invidious process of favoritism and selection, where AUSAs are either preferred or disfavored based on their race, gender, EEO participation, or some combination of these protected classifications.  Management's support of Daves would have been appreciably stronger if he were not African-American, did not exhibit gender characteristics that management found off-putting, and accepted his subordinate position without complaint.  In fact, when Daves litigated the cases management saw fit to give him, his supervisors gladly left him alone, for the most part.

267.   Far from being afforded the genuine article of equal employment opportunity, in short, the USAO, with EOUSA's express of implicit approval, has given Daves employment opportunities substantially inferior than those of his similarly situated colleagues.  The absence of *exact* correlations with respect to each and every comparator is inconsequential, because there is sufficient similarity with each in all material respects to permit useful comparisons.  In its persistent efforts to maintain and justify the blatantly unequal treatment, management succeeded in relegating Daves to the "back of the bus."

268.   Civil management's harassing conduct, coordinated through the Front Offices of the USAO and EOUSA, made it much harder for Daves to complete his work, made him "an object lesson about the perils of complaining," created a work environment

FIRST AMENDED COMPLAINT

in which co-workers felt compelled to distance themselves from and avoid associating with him or seeking his guidance and counsel, negatively impacted his future career prospects in material respects as evidenced in significant part by the denied promotion, thwarted his short and long-term career goals and aspirations, negatively affected his future career prospects, and thus effectively eliminated any threat he, and persons like him, might otherwise have posed to entrenched managerial authority.

269.   Because the DOJ has historically cloaked its USAO managers with tremendous discretion and authority, the pattern of managerial misconduct visited upon Daves -- the sole gay black man perhaps in the history of the office – is particularly reprehensible under Title VII.  The fact that these managers may have acted in consultation with, at the behest of, or pursuant to advice given by human resources officials, the Office of General Counsel, or superiors at EOUSA or Main Justice does not immunize Defendant for misconduct that his subordinate managers knew or had reason to now effectuated and perpetuated violations of Title VII.

270.   Being targeted by a group of ten or more experienced managers, most of whom also happen to be skilled top-notch litigators, who worked as a cohesive unit to orchestrate over a number of years multiple traps intended to generate much needed damning evidence is not the kind of ordinary, workplace friction and strife that any employee should expect to have to encounter or combat.  Management has robbed Daves' work environment of any predictability, which only exacerbates the stress attendant to the normal unpredictability of litigation.

91

FIRST AMENDED COMPLAINT

271.   Requiring Daves to run a gauntlet of wholly manufactured problems in return for the privilege of being allowed to remain in the Civil Division and make a living is as demeaning and disconcerting as the harshest of epithets.  Moreover, for all intents and purposes, the EEO office of EOUSA merged with management of the USAO, which also reported to EOUSA, in order to gain negotiating leverage and intimidate Daves into dropping his complaint and acceding to the collective will of DOJ.  As high-level representatives of the Department of Justice, they were charged with a heightened duty to put aside any personal predilections that might impair their better judgment and serve justice; they did not have "license to lawless conduct."

272.   The pervasive hostility has materially altered the terms and conditions of Daves' employment, were causally connected to Daves' protected EEO activity, and would have deterred any reasonable person in Daves' position from participating in protected EEO activity.  Daves reasonably fears that a palpably subordinate role and isolated status have become permanent features of the employment conditions under which he must endeavor to make a living.

273.   Daves' present hostile work environment will continue for as long as the present managers retain their positions.  Indeed, the workplace oppression is sufficiently extraordinary and egregious as to overcome the normal motivation of a competent, diligent, and reasonable employee to remain and earn his livelihood and serve his employer.  Even though Daves has continued to work at USAO, which essentially mitigates his damages, Civil management's pattern and practice of harassment has created

a work environment in which a reasonable person could easily conclude that he has no rational alternative but to resign.

274.   The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular set of circumstances at any particularly time.  For this reason, although any attempt to separate Daves' identity at the intersections of race, gender, and EEO participation could distort or ignore the particular nature of his experience, Daves also asserts separate hostile work environment claims based on each impermissible factor, as well as claims based on the combination of impermissible factors.

275.   As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

### THIRD CAUSE OF ACTION:

### RETALIATION

276.   Paragraphs 1 to 275 are incorporated herein by reference.

277.   Under Title VII, the adverse actions comprising the retaliatory hostile work environment fit the paradigm for an actionable retaliation claim as well.  As with each of the other claims, there is both direct and indirect evidence supporting this claim.  Besides

the mosaic of convincing facts establishing an intent to punish Daves for asserting his

EEO rights, particularly after he lodged the complaint giving rise to this action, a

reasonable employee would have found the challenged retaliatory actions to which Daves

was subjected materially adverse, such that they might well have dissuaded a reasonable

employee of the USAO from making or supporting a charge of discrimination.  Further,

the materially adverse actions were causally linked to Daves's protected activity.

278.   As a result of the unlawful conduct, Daves has suffered, and will continue to

suffer, injury and damages in the form of lost income, lost reputation and professional

status, lost professional and personal opportunities, lost short and long-term career

expectations and satisfaction, lost ambition and motivation, substantial and increasing

humiliation, lost belief and faith, deteriorating health and well-being, significant and

increasing emotional distress, and other actual damages in an amount to be proved at trial.

## FOURTH CAUSE OF ACTION:

## SYSTEMIC DISCRIMINATION & RETALIATION

## BASED ON RACE, GENDER, OR EEO PARTICIPATION

279.   Paragraphs 1 to 278 are incorporated here by reference.

280.   Daves has experienced systemic discrimination consisting of "[e]mployment

policies or practices that serve to differentiate or to perpetuate a differentiation in terms or

conditions of employment of applicants or employees because of their status as members

of a particular group.  Such policies or practices may or may not be facially neutral, and

intent to discriminate may or may not be involved."  Facially discriminatory systems or

even facially neutral systems adopted to serve unlawful discriminatory motives can be challenged at any time.

281.   In terms of case assignments, promotions, and other opportunities for career advancement, USAO has subjected Daves and other persons in his protected classes to an ongoing, continuous series of discriminatory acts, taken pursuant to discriminatory policies and practices.  USAO's actions evinced a longstanding and demonstrable policy of discrimination based on race, gender, and retaliation for participating in protected EEO activities.

282.   Although there has been some recent evidence of subsequent remedial measures taken in anticipation of this litigation, sub-standard treatment has historically been a common experience shared by most, if not all, African-American and Hispanic attorneys in General Civil.  Compared to their similarly situated colleagues, they have disproportionately received votes of no confidence.  They have been infrequently selected to serve as office advisers, to assist or train junior attorneys, to assist senior attorney at trial, to handle heavy-duty litigation such as class actions and high-exposure medical malpractice matters, etc.  Subsequent remedial measures taken to hide such invidiously discriminatory practices neither cured the past violations nor eliminated present ones.

283.   Generally speaking, USAO has treated African-American and Hispanic attorneys as suspect employees, hired to meet affirmative-action quotas; Asian attorneys have been held in slightly higher regard; and Caucasian attorneys have retained workplace preeminence.  The periodic and continuing implementation of discriminatory practices

was implicitly, if not explicitly, condoned by DOJ and became USAO's standard

operating procedure.

284.   A policy or custom may be found either in an affirmative proclamation or

observance of policy or in the failure of an official to take any remedial steps after the

violations.  In this case, both exist.  Daves was told, fourteen years into his employment,

that he was hired to do Title VII, and during that entire time management has kept him

segregated in that respect, offering him separate and unequal employment opportunities.

Since attorneys afforded the opportunity to prove their mettle typically move on to handle

increasingly more difficult and challenging assignments, the discriminatory practices that

tarnished Daves' initial assignments have negatively impacted each and every subsequent

assignment such that it delivered less opportunity for Daves and, thus, constituted its own

separate unlawful employment practice.  The discriminatory case assignment practices

continue to the present, as shown by the stream of illusory projects offered to Daves after

he made his initial contact with EEO as well as the continuing failure to offer Daves a

dual assignment by which he could either train a new attorney or assist an experienced

attorney at trial.

285.   Further, the Civil Division of USAO, as a general policy or practice, does not

recruit and hire African-American or Hispanic males.  By intentionally keeping the

numbers of African-American and Hispanic males low, management effectively

precluded the development of the critical mass needed to obtain EEO relief as a class, in

light of the numerosity requirement of 29 C.F.R. Section 1613.601(b).

FIRST AMENDED COMPLAINT

286.   Further, pursuant to a system that operates in an intentionally discriminatory manner, management has systematically denied Daves and other African-American attorneys leadership positions.  Pursuant to the same system, management has been less forgiving of mistakes committed by Daves, has placed him under more onerous work conditions, which included arbitrary tests and other obstacles to success, and has routinely denied him tougher, career-enhancing assignments, even after he repeatedly proved his ability and desire to excel.  In Daves' case, these systemically discriminatory terms and conditions, which are widespread throughout USAO, have been further exacerbated by gender stereotyping that demean him and permanently relegate him to a subservient status within the office.

287.   In addition, the pattern or practice of discrimination and retaliation arose out the abject failure by management to investigate Daves' complaints, the complete lack of reprimand or other discipline for the officials involved, even when his supervisors were aware of the infractions, and the "turn a-blind-eye" delegation of investigation to officers involved in the grievances, such as Weidman.

288.   EOUSA was charged with evaluating the performance of the United States Attorneys Offices, making appropriate reports, and taking corrective action where necessary.  EOUSA was also charged with providing general legal interpretations, opinions, and advice to United States Attorneys concerning allegations of misconduct, adverse actions, and ethical and conflict of interest questions.  Yet, EOUSA officials were surprisingly recalcitrant and defiant in the face of its substantial legal duties and

97

FIRST AMENDED COMPLAINT

responsibilities.  They consistently failed to investigate Daves' complaints of retaliation by Weidman, and they consistently failed to issue reprimands or other discipline for Weidman and other managers who participated in the retaliation, even after they became aware of specific facts driving the need for swift, effective intervention.

289.   At each stage of the EEO investigation, Daves provided specific information detailing the retaliation he was experiencing in the workplace, as a result of exercising his employee rights.  Daves filed notice upon notice amending his original complaint to include additional forms of discreet act discrimination and retaliation, as well as continuing harassment, as they happened.  O'Brien, Cardona, and eventually EOUSA officials knew or should have known not only about the fact of each filing but also about the substance of each filing, summaries of which are set forth under the retaliation section. Nothing prevented any of these high-ranking officials from conducting or directing their own investigations and taking prompt, effective remedial measures to end the misconduct. Yet, they allowed it to continue for months on end and grow worse.

290.   O'Brien, Cardona, and EOUSA officials either directed the course of action taken by Weidman, in which case they created a policy of retaliation, or they delegated to Weidman any investigations conducted in response to Daves' complaints, knowing that Weidman had a professional and likely personal stake in the outcome, in which case they ensured Daves' defeat.  The turn a-blind-eye approach of O'Brien, Cardona, and EOUSA sent the clear message to Weidman and the other Civil Division supervisors that their supervisory authorities were willing to support their misconduct, giving the conviction

that they could get away with anything.  The result of this lack of meaningful oversight was an injury in fact to Daves, whose civil rights were severely chilled.

291.   The systemic discrimination and retaliation experienced by Daves was *because of* his race, gender and EEO activity.  The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular adverse action at issue.  For this reason, although any attempt to separate Daves' identity at the intersections of race, gender, and EEO participation could distort or ignore the particular nature of his experience, Daves also asserts separate claims based on each impermissible factor, as well as claims based on the combination of impermissible factors.

292.   As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION:

### *QUID PRO QUO* HARASSMENT BASED

### ON RACE, GENDER & EEO PARTICIPATION

293.   Paragraphs 1 to 292 are incorporated here by reference.

294.   In his detailed EEO charge, Daves described how management has engaged

and continues to engage in widespread personnel policies and practices influenced by favoritism and cronyism based on a combination of race, gender, and participation in protected EEO activities. Not only are work assignments materially and negatively affected in this way, but also client and staff relations are as well.

295. For example, management has routinely supported preferred AUSAs who encounter client and staff conflicts but withholds support to disfavored AUSAs who encounter similar issues. Management's actions in this respect have created a workplace laden with hostilities, as attorneys, new and senior alike, are sent a strong, unmistakable message that their career development, if not survival, depends on acquiescing to management's will and illicit mission.

296. None of the African-American female attorneys in General Civil have lodged complaints with EEO or other investigatory bodies about race or gender-based disparities in work assignments, promotional opportunities, and other areas, despite having been on notice of facts strongly suggesting the existence of such disparities. By contrast, Daves dared to "step out of line" and complain not only to EEO and DOJ auditors, but to his supervisors as well, and, as a direct result, management at USAO and EOUSA have treated Daves worse than the African-American female attorneys who did not complain.

297. Management's actions, which echo the mean chill experienced in prior years by other EEO complainants, have sent a strong message to all line attorneys: Those employees willing to remain silent about, fall in line with, or join in the demeaning, exclusionary, and retaliatory policies and practices receive the essential benefits of

managerial support, while those who have declined have been severely and unfairly punished, made an example of, ostracized, even ridiculed.  Daves' employment has become conditioned on his willingness to endure disparate treatment, harassment, and retaliation.

298.    The *quid pro quo* harassment experienced by Daves was *because of* his race, gender and EEO activity.  The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular set of circumstances at the particular time.  For this reason, Daves asserts separate claims based on each impermissible factor, as well as claims based on the combination of impermissible factors.

299.    As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION:

## ADVERSE IMPACT BASED ON

## **RACE, GENDER & EEO PARTICIPATION**

300.    Paragraphs 1 to 299 are incorporated here by reference.

301.    Since filing his original charge, Daves has learned facts suggesting an

additional theory of liability, which would have been reasonably encompassed in the scope of the investigation, had he been afforded one.  Management has employed and continues to employ facially neutral employment  policies and practices that have had the effect of disproportionately excluding persons in AUSA Daves' protected classes, including race, gender, EEO participation, or some combination thereof.  For example, management has assigned cases in accordance with a "point" system, pursuant to which minority attorneys, particularly those who are African-American or Hispanic or EEO participants, historically received a disproportionate number of the lowest profile, most burdensome, and least desirable cases.

302.   The disparate impact discrimination and retaliation experienced by Daves was *because of* his race, gender and EEO activity.  The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular neutral policy or practice at issue.  For this reason, Daves asserts separate claims based on each impermissible factor, as well as claims based on the combination of impermissible factors.

303.   As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

FIRST AMENDED COMPLAINT

## REQUEST FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Daves respectfully requests that this Court enter judgment for him and against the defendant and that the judgment include the following relief:

1.     A preliminary and ultimately permanent injunction that orders the DOJ and the USAO, through concrete measures specified in a negotiated consent decree, to: (1) ensure and correct at the local and national levels any and all past unlawful employment policies, procedures and practices from which this action arose; (2) institute and implement firm, enforceable prospective measures that require Defendant to treat Daves, and employees like him, on a consistently and permanently lawful and equal basis with those similarly situated AUSAs who have historically received more favorable treatment, particularly with respect to recruitment, hiring, training, and career development through case assignments, promotions, and other employment opportunities; and (3) take any and all necessary affirmative measures, including but not limited to transferring, demoting, or removing any and all offending officials from the positions they held during the time periods giving rise to this action, in order to ensure that all AUSAs in the Civil Division have a reasonable opportunity to enjoy a work environment responsibly free from unwarranted and unlawful hostilities, harassment, intimidation, ridicule, and abuse;

2.     A preliminary and, later, permanent injunction awarding Daves and other AUSAs in Daves' protected classes any and all duties and responsibilities that they earned or would have earned but for the unlawful discriminatory and retaliatory conduct of the

offending officials, including but not limited to reinstating Daves and any other constructively discharged employees to their official positions of record and promoting them to management-level supervisory positions in or outside the Civil Division;

3.      Daves' actual damages, including but not limited to back and front pay and other wages and benefits, as determined at trial;

4.      compensatory damages, including but not limited to damages for the significant and increasing emotional distress that Defendant's unlawful conduct has caused Daves;

5.      Daves' attorney fees and costs under Title VII and the Equal Access to Justice Act;

6.      any and all appropriate remedies available under Title VII;

7.      pre- and post-judgment interest, to the maximum extent the law allows; and

8.      all other relief as law and justice requires.

DATED:   July 2, 2009

Respectfully submitted,

MICHAEL L. COHEN, a PLC


By: */s/ Michael L. Cohen*
     Michael L. Cohen
     Attorney for the Plaintiff, Ira Daves

FIRST AMENDED COMPLAINT

1

## JURY DEMAND

2          Plaintiff demands a jury trial per Fed. R. Civ. P. 38 on all issues that may be tried to

3    the jury.

4

5    DATED:  July 2, 2009              MICHAEL L. COHEN, A PLC

6

7                                  By: */s/ Michael L. Cohen*

8                                  Michael L. Cohen
                                   Attorneys for Plaintiff Ira A. Daves

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT