1  Michael L. Cohen, SBN 206253
2  MICHAEL L. COHEN, a PLC
   707 Wilshire Boulevard, Suite 4100
3  Los Angeles, California 90017
4  Telephone:  (213) 943-6800
   Facsimile:  (213) 943-6850
5  michaellcohen@cohen-law.org
6  Attorneys for Plaintiff, IRA A. DAVES
7

8              **UNITED STATES DISTRICT COURT**
9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10                    **WESTERN DIVISION**
11

12 IRA DAVES,                    )  Case No.   CV 08-07376-CAS (AGRx)
                                 )
13          Plaintiff,           )  *Assigned to Hon. Christina A .Snyder*
14                               )  *Courtroom 5*
   vs.                           )
15                               )  **SECOND AMENDED COMPLAINT**
16 ERIC H. HOLDER, JR., Attorney )
   General of the United States. )  **[Pursuant to 42 U.S.C. Sections 2000e *et***
17                               )  ***seq.,* as amended]**
                                 )
18          Defendant.           )  **JURY TRIAL DEMANDED**
19 _____)

20      This Second Amended Complaint is based on Daves' personal knowledge and upon
21
22 information and belief.
23              **JURISDICTION & VENUE**
24
       1.     This suit is for damages and injunctive relief under Title VII of the Civil
25
26 Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*  This Court has subject matter jurisdiction
27 under 28 U.S.C. § 1331 as this is a civil action arising under the laws of the United States.
28

2.      This Court may assert personal jurisdiction over the parties in this case. Daves resides in Los Angeles, California.  Dave's employer, the Civil Division of the United States Attorney for the Central District of California ("USAO"), is located in this judicial district.

3.      Venue is proper under 28 U.S.C. § 1391(b).  All or most of the events or omissions giving rise to Daves' claims occurred in this judicial district.

## THE PARTIES

### The Plaintiff:  AUSA Ira Daves

4.      Daves is currently employed as an Assistant United States Attorney ("AUSA") in the USAO.  The USAO is an agency of the federal government and is subject to the laws of the United States.  The AUSAs serve as the nation's principal litigators under the direction of the Attorney General.

### The Defendant: U.S. Attorney General, Eric Holder

5.      Defendant Eric H. Holder, Jr. is the Attorney General of the United States. He heads the Department of Justice ("DOJ").  Holder is substituted under Fed.R.Civ.P. 25(d) for Michael B. Mukasey, the former Attorney General.  The DOJ is an agency of the federal government and is subject to the laws of the United States.  The Executive Office for United States Attorneys ("EOUSA") is an agency and of the DOJ and is also subject to the laws of the United States.  EOUSA was created to provide for close liaison between the DOJ and the USAO throughout the country.  During the relevant time periods, EOUSA provided general executive assistance and supervision to USAO.

## STATEMENT OF FACTS

6.     Daves received his J.D. from Harvard Law School.  After clerking and three years as an associate at O'Melveny & Meyers, Daves accepted an offer to join the USAO as an AUSA in October 1995.

7.     The docket of a civil AUSA consists of defending federal agencies and federal employees in all kinds of civil lawsuits.  When he was hired, Daves was told that he serve as a general civil litigator.

8.     Over the last 14 years, Daves established an exemplary record at the USAO. He got favorable results in the vast majority of his cases—which were mostly Title VII cases—and Daves was repeatedly rewarded for his hard work and effective advocacy.

9.     Daves has been recognized with numerous commendations, including one that Leon W. Weidman—the Chief of the Civil Division throughout Daves' tenure—called "one of the most impressive commendations letters I have ever received."  Daves has received multiple honors, including a Special Achievement Award for Sustained Superior Performance of Duty and a highly coveted nomination for a Director's Award. Soon after the nomination, the U.S. Attorney assigned Daves to assist the DOJ in a high-profile pattern-and-practice investigation of a local police department.

10.     That pattern-and-practice investigation was a decade ago.  Since then, Daves' career at the USAO has steadily stalled, eventually reaching a dead-end.  Daves hit this dead-end because of a disagreement with his managers over the types of cases Daves is qualified to handle versus the types of cases they are willing to give him.  The types and

SECOND AMENDED COMPLAINT

complexity of cases that an AUSA handles largely determines his career in the USAO, so this dispute raises fundamental questions about Daves' present and future marketability and earnings potential.

11.     Throughout his employment at the USAO, Daves has engaged in EEO activities, formal and informal.  These activities include service on the USAO's hiring committee, serving as the office's Special Emphasis Program Manager responsible for representing minority interests to management, giving deposition testimony in connection with a co-worker's Equal Employment Opportunity ("EEO") complaint, voicing disapproval of the office's discriminatory policies and practices with respect to the hiring of externs, criticizing management's case assignment practices to DOJ auditors, and filing the EEO complaint underlying this action.

12.     Since Daves' initial requests to increase his development by expanding his practice area, Daves' supervisors, all of whom reported directly to Weidman, uniformly and without good reason denied him meaningful work outside of Title VII.

13.     Despite consistently favorable reviews throughout his tenure, Daves' supervisors never permitted him to train a new attorney in litigation, even for a Title VII case.  They denied him these opportunities even as they told him that, as a senior attorney, he was expected to mentor and assist junior attorneys.  The rare dual assignment given to Daves was only at Daves' repeated request and only in an emergency.

14.     At the same time, no such restrictions were placed on the vast majority of similarly situated AUSAs, most of whom were white.  The Civil supervisors have given

numerous if not nearly every one of these other civil AUSAs, junior and senior attorneys alike, a meaningful and wide variety of challenging, career-enhancing assignments, including dual assignments intended to train and assist newer attorneys.

15.     When a white, male attorney defaulted in a case, Daves was assigned to handle the default so that the attorney's European vacation would not be disrupted.  In contrast, when management mistakenly assumed that Daves needed coverage for a hearing in one of his *pro per* prisoner cases, they called Daves while he was overseas on vacation and ordered him back to the office to cover it.  Senior white male attorneys had no difficulty receiving assistance from junior attorneys to cover the more routine research or paralegal-type duties that arise in litigation.  A senior white male attorney was relieved of a Title VII assignment without being required, as Daves had been in comparable circumstances, to accept a case from the attorney to whom one of his numerous Title VII case was transferred.

16.     The preferential treatment given to these and other white attorneys has benefited their careers.  In addition to what has already been described, several white male attorneys left General Civil to pursue career opportunities in the Criminal Division, and a number of them were subsequently promoted to supervisory positions.  One was soon thereafter appointed to a federal magistrate judge position.  African-American attorneys who have devoted the better part of their legal careers working in the Civil Division have not received career advancements even remotely comparable.  At least two white male

/ / /

attorneys were, without controversy, provided secretaries who could take dictation. Daves was denied such assistance, without discussion.

17.    When Daves asked his managers why, they insisted that he continue to focus on Title VII, in isolation and without any significant interaction with junior attorneys, management gave various responses that seemed plausible at the time.  At the same time, management repeatedly assured Daves that there was no reason he would not someday be assigned the kinds of cases he had been requesting.  Daves believed his managers.

18.    Daves' managers' reasons included that there was a shortage of attorneys who had the ability or experience to handle Title VII cases, which were among the most difficult cases in the office and therefore required Daves' particular training and expertise. Daves accepted that explanation until he started noticing that most of the newest, least experienced attorneys in the office were routinely assigned Title VII cases.  As Daves finally realized, this refusal arises from his managers' prejudice—conscious, unconscious, or some combination of both.

19.    Once Daves became a senior litigator in the office, all but a few of his assignments were cases that could have been assigned to junior attorneys but were instead assigned to Daves.  These were dead-end assignments.  Further, many of these cases were pending in the Eastern and Southern Divisions of the Central District, which forced Daves to spend a disproportionate amount of his time traveling to the federal courthouses in Riverside and Santa Ana.

/ / /

SECOND AMENDED COMPLAINT

20.     Upon information and believe, Daves' managers began to impose on Daves a series of secret tests through which Daves could ostensibly prove himself.  These obstructions were designed to concoct a pretext for refusing to assign Daves complex cases outside Title VII.  Management's plan was implemented with the express concurrence or acquiescence from executive members of the Front Office at USAO and upper-level officials at EOUSA.

21.     Although unaware that he was essentially being set-up, Daves did everything asked of him.  For example, Daves successfully handled a last-minute Ninth Circuit argument.  The Civil Appellate Chief reported that Daves' argument was "magnificent."

22.     Daves could not have known that management was manufacturing a pretext for denying him opportunities because management's decision-making process was secret.  Most of management's actions are confidential. Any charge of racism, sexism, or retaliation necessarily would have to be based on inference and educated guesswork.

23.     The six-person management team, with input from the Front Office, is able during their confidential sessions, to strategize ways in which to position favored employees for future advancement—for instance, by awarding them special assignments through which they can improve their skills and demonstrate their mettle, or by highlighting their accomplishments to executive officials higher on the chain. Conversely, management is able to consign disfavored employees to professional obscurity—for example, by assigning them cases they cannot reasonably be expected to handle without substantial administrative or other support and then withdrawing that

SECOND AMENDED COMPLAINT

support, or by regularly disparaging them to higher officials.  These matters are carefully calculated and not left to chance.

24.    It was under these conditions that management was able to effectively prevent his opportunity for advancement, once it was determined that that was the course of action it wished to take.  The supervisors, Weidman in particular, simply could not see—or perhaps would not allow themselves or others to see—someone like Daves— black, openly gay, assertive on issues related to diversity and gender—representing the office in highly visible cases.  Their views of Daves' abilities, insofar as they were denigrating, were closely tied to deeply ingrained race and gender biases, as were their reactions to Daves' personality, which often contradicted their expectations of how a black man holding a subordinate position should behave.

25.    During a private discussion with Weidman, Daves asked if there was anything he needed to do to be assigned more substantial cases outside Title VII. Weidman assured Daves that there was no problem and that it was just a matter of time before Daves would receive the requested assignments.  Weidman later used the information he gathered during these private discussions and other conversations to bolster his pretext for denying Daves the assignments he had been requesting and, by all objective indications, had fairly earned.

26.    On January 31, 2008, management told Daves, for the first time, that it was not going to treat him fairly in its case assignments, dual attorney assignments and promotions, based on an "undisclosed" communication problem.  Weidman held a

disciplinary-type meeting in which he informed Daves that he had uncovered deficiencies in Daves' performance dating back "a year or two." Weidman further informed Daves that those performance deficiencies now precluded Daves from being assigned to the kinds of non-Title VII cases he had been requesting for years.

27. Throughout the meeting, Weidman was demeaning and hostile. He described Daves as arrogant and insufficiently grateful for the Title VII and *pro per* cases that he had been assigned. Weidman declared—in a moment of inaccurate historical revision—that he had hired Daves as "a Title VII lawyer."

28. When Daves objected that Weidman had never before mentioned these alleged deficiencies, Weidman blurted, "*I'm telling you now!*" Rather than provide specific facts, Weidman mentioned vague "communication" problems and "numerous complaints" lodged against Daves, to which he had personally responded over the past year or two. When Daves asked for specifics, Weidman demurred, declining to identify the complainants or reveal any particulars.

29. Upon information and belief, Weidman refused to provide the particulars because there were none to give. Only days before the January 31st meeting, Daves had received—again—the highest possible performance rating for his work in the prior year. A year or two of complaints requiring Weidman's personal intervention would not have supported the rating that Daves had just received.

30. Daves was blindsided. Before the January 31st meeting, his managers had never told him about these alleged performance problems, so he had no opportunity to

address them before his managers had made their decision. Management's justification for the decision to formalize the denial of equal treatment was highly suspect.

31.   In an environment in which EEO lawyers at EOUSA were disproportionately African-American, Weidman specifically and unequivocally told Daves that he had been hired as "a Title VII lawyer." Given that environment, the term "Title VII lawyer" could reasonably be understood as a code word for "black lawyer," the intent to discriminate was thus implicit in Weidman's comment. Daves was demoralized.

32.   Management's decision had a decided nexus to race and gender bias, as well as punishment for employment activity protected by Title VII. Throughout his career, Daves sought chances to thrive within the office at the same time that he pursued changes that would improve it. To that end, Daves engaged in multiple EEO activities, such as implementing measures designed to increase diversity within the office, all of which were intended to improve the working conditions within the office and to fortify the USAO's stated mission as an Equal Opportunity employer. It was those EEO activities that constituted protected forms of expression under Title VII.

33.   The meeting compelled Daves to realize—reasonably and for the first time—that the difference in the treatment he had received in terms of his case assignments and other job opportunities was, in fact, due to unlawful discrimination and retaliation for some or all of his prior EEO activities. In fact, the insinuation that the sole African-American male attorney did not have the mettle for heavy-weight litigation outside the single area of employment discrimination was patently offensive.

34.    Without knowing or suspecting it, Daves entered the USAO reporting to and trying to impress a number of influential managers who harbored biases against two of the historically disadvantaged groups to which he belongs.  From the start, the default assumption for Daves, in the minds of these supervisors, has been that he is somehow not as good as his similarly situated white counterparts that his aptitude for first-chairing high-exposure cases outside Title VII is somehow inferior to theirs, that he is, by comparison, no more than minimally or questionably competent.

35.    Opportunities to advance in the Civil Division were—and remain—few and far between.  When they arise, candidates for promotion are required to demonstrate a wide variety of skills for litigating complex cases and for managing other attorneys. These skills cannot be developed or demonstrated through the kinds of teeth-cutting cases that Daves was repeatedly assigned over the years.

36.    The discrimination evidenced by these facts is underscored by comments that have been made to Daves or about Daves.  During his initial interview for the position, Daves inquired about promotional opportunities.  He was told flat out that there were none.  At times, unflattering comments were made about Daves' personality.  He has been referred to in ways that were intended to irk him and raise questions about his masculinity.  After 11 years as an AUSA, Daves was told that a simple *pro per* prisoner case was "in line" with where he was in his development.  He was once admonished for not doing his own secretarial work.  When he first started, he was called "crazy" for expressing an interest in doing Title VII cases.

37.     In the time following the meeting, management has firmly stuck by its adverse decision yet has declined to offer Daves any evidence supporting the offensive default assumption on which it was implicitly based.  Moreover, other AUSAs, particularly white males, have not been comparably disadvantaged.

38.     When Daves first complained to the appropriate DOJ officials about unlawful discrimination, he was met with resistance, which reinforced Daves as *persona non grata* in the office.  Soon thereafter, and in direct response to the complaint Daves lodged with their superiors at USAO and EOUSA, Daves' managers commenced carefully coordinated steps designed not only to punish, silence, and discredit him, but also to deflect attention away from their past and present discriminatory practices.

39.     In particular, the managers of Civil—all of whom have enjoyed lengthy careers in government and who were acting in flagrant self-interest to protect their reputations at the expense of a hard, honest evaluation of the facts—enjoyed personal and professional relationships with high ranking officials both within USAO and at EOUSA. Faced with the charges Daves leveled regarding unlawful conduct, these managers relied upon these relationships to bolster their own credibility and thwart any meaningful investigation of the issues raised by Daves' complaint.

40.     The collusion crystallized during the administrative processing of Daves' complaint.  The EEO office of the EOUSA, to which USAO management also reports, unduly delayed commencing any investigation for six months.  The investigator finally assigned to the matter was adversarial and gave the matter only cursory attention.  For

instance, in a response to a complaint that focused on disparate treatment in case assignments and other job opportunities, Civil management was not even asked, let alone required, to produce a single document demonstrating and explaining their assignment practices.  In this way, and in others, management-level officials at the USAO and EOUSA worked collectively and aggressively to undermine Daves' efforts to investigate the systemic problems alleged in his complaint, perhaps the ultimate form of retaliation.

41.    The other forms of retaliation Daves has experienced since he first contacted EEO in February 2008 have been skillful, relentless, and continue to this day.  For instance, management has repeatedly passed Daves over for career-enhancing assignments, has played a series of administrative pranks on him, each of which was designed to occupy his work time and undermine his morale, has bad-mouthed him and segregated him from his colleagues, and most recently has even tried to set him up for a swift, just-cause termination.

42.    On February 7, 2008, Daves provided EEO a Pre-Complaint Form, in which he alleged disparate treatment in his work and mentoring assignments in the USAO.  He alleged that the disparate treatment was based on his race (African-American), gender (male), age (49 at the time), sexual orientation (gay), and reprisal.

43.    EEO assigned Daves a counselor, who contacted Daves on February 22, 2008, to advise him of his rights.  Daves specifically encouraged his counselor to obtain records of case assignments directly from management, which was in a much better position to provide all statistical information.  Daves requested an office-wide

SECOND AMENDED COMPLAINT

examination of case assignments over a period of years in an effort to redress a pattern and practice of unlawful discrimination.

44.    On March 7, 2008, Daves' EEO counselor confirmed that the scope of his complaint would include hostile work environment and pattern and practice allegations.

45.    In his formal complaint, Daves checked the boxes for discrimination based on race, sex, age, sexual orientation, and reprisal.  Daves further alleged a "continuing denial of opportunity for advancement through invidious selection of work assignments and mentoring opportunities; denial of promotion; continuing failure to take prompt, effective remedial action for discrimination and retaliation under each of the following theories: disparate treatment, pattern and practice, and hostile work environment."

46.    Yet despite being notified verbally and in writing of all issues set forth in Daves' complaint, including allegations that Daves was presently being subjected to a hostile work environment requiring prompt investigation and, if necessary, prompt, effective remedial action, EEO's response was lazy and ineffective.

47.    Because he had not been afforded prompt remedial measures, Daves experienced ever-escalating supervisory harassment in retaliation for his EEO activity. He reported the harassment to his EEO counselor, but his counselor declined to intervene.

48.    In August 2008, EEO finally assigned an investigator—Michele Crawford.

49.    On September 2, 2008, Daves requested that his complaint be amended to include additional related allegations based on recent events in his employment. Specifically, Daves notified Crawford that management had been failing to ensure the

prompt payment of his litigation expenses, had withdrawn a sizeable performance-based monetary award that was recently issued to him, and had failed to take adequate steps to fix his computer, which was crashing daily.

50.     Crawford confirmed that she was serving two functions.  She was serving as the agency's investigator, charged with developing "an impartial and appropriate factual record."  But she also apparently had been delegated responsibility for determining which issues would be investigated.

51.     During her investigation, Crawford displayed a lack of tact and legal acumen.  One of her first questions to Daves was whether he "looked black."  She seemed unfamiliar with the facts that Daves provided in his previous statements.  Although the parties agreed to mediate Daves' dispute, the case did not settle and Daves proceeded with this lawsuit.

52.     Following the filing of his EEO Complaint, the retaliation against Daves has become more patent, even Daves' direct supervisor has ceased engaging in regular communications, absent absolute necessity.  In fact, all management-level employees have rigidly avoided all contact with Daves, absent necessity.  There is a palpable chill in the air; the silence is provocative.  Snubs, which often occur, are one thing; but the abject failure to communicate regarding work-related issues has made it much more difficult for Daves to perform basic job duties.

53.     Besides suffering administrative hassles, Daves received a substantial increase in the paralegal-type duties he was required to perform, after Weidman reversed

a long-standing work-sharing agreement with an agency.  Daves' paralegal duties were further increased when management assigned him a slew of cases filed against an agency that management knew had limited administrative resources.  In addition, his work received a much greater and more critical level of scrutiny than it ever had.

54.    Since taking his employment dispute to EEO, Daves has been specifically instructed not to contact junior attorneys directly to request litigation assistance.

55.    In addition to these other acts of discrimination, Daves was denied a promotion to which he was fairly entitled.  Weidman also made negative comments about Daves when Daves applied for a magistrate judgeship.

56.    Even if discriminatory choices like these were a reflection of clients' preferences, that fact would not excuse this discrimination because client preferences based on race stereotypes are not a "bona fide occupational qualification" under Title VII.

57.    In April 2009, Daves was diagnosed as having developed acute medical problems stemming from the severe stress of his workplace.  The diagnosis required him to take an extended leave of absence.

58.    Daves has exhausted his administrative remedies.  Administrative exhaustion is not required where the remedies are inadequate, inefficacious, or futile, where pursuit of them would irreparably injure the plaintiff, or where the administrative proceedings themselves are void.  After the 180-day deadline passed, it became abundantly clear that Daves' multiple good-faith efforts to have the agency conduct an unbiased, thorough investigation were misdirected.  Yet, Daves still tried to resolve the matter successfully by

mediation and conciliation. He did everything he could reasonably be expected to do. EOUSA expressly acknowledged that Daves exhausted his administrative remedies when it finally dismissed his complaint.

59.   To the extent that the exhaustion requirement was not met with respect to any particular claim, although Daves makes no concession on this point, the exhaustion requirement was satisfied by principles of equity, such as waiver, estoppel, unclean hands, and tolling, as set forth herein.

60.   That this complaint encompasses unlawful discreet acts that pre-date the January 31, 2008 meeting by a period exceeding 45 days does not render those events untimely. Even if some of Daves' claims are time-barred, the filing of a timely charge is a requirement that is subject to waiver, estoppel, and equitable tolling. By accepting Daves' charge for investigation, EEO waived any objections to technical defects in the charge. More importantly, any delay in Daves' discovery of the discrimination was not due to a lack of diligent inquiry on his part. Management's aggressive, proactive steps to erect an impenetrable wall of privacy and confidentiality around its assignment and other personnel practices effectively shielded from discovery their unlawful nature. An employer who, through the affirmative use of covert acts and deception, effectively avoids the detection of its unlawful conduct and thereby prevents the timely filing of a complaint is estopped from asserting lack of timeliness as an affirmative defense.

61.   Finally, management explicitly conditioned favorable performance ratings on the extent to which employees placed the office's interests and needs over their own,

which had the intended effect of discouraging complaints.  Management engaged in additional practices that discouraged the exercise of employment rights.  Under these circumstances, the limitations period should be equitably tolled in favor of Daves who could not otherwise resurrect any untimely claims.

**FIRST CAUSE OF ACTION:**

**DISPARATE TREATMENT BASED**

**ON RACE, GENDER AND EEO ACTIVITY**

62.     Paragraphs 1 to 61 are incorporated here by reference.

63.     In terms of management-level opportunities, the USAO has yet to break the color barrier.  Consistent with its historically exclusionary hiring and promotion practices, USAO management has subjected Daves to roadblocks that no other attorney in the office has experienced.  He was singled out early in his career and has been treated markedly less favorably than others similarly situated on account of race, gender and EEO activity.  The policy or pattern of discrimination constitutes its own violation.  It is also proof of management's intent to discriminate and the falsity of management's asserted justification for its continuing discriminatory conduct.

64.     The allegedly temporary assignment of Daves as a "Title VII Lawyer" turned into perpetual *de jure* segregation, affected through the continuing application of egregious employment practices driven not by carefully studied individual assessment but by stubborn, irrational prejudice -- the opposite of a meritocracy.

/ / /

65.     When Daves first expressed an interest in broadening his practice area, he was ignored.  When he started pursuing it, he was punished.  Civil management became proactive in creating a *post hoc* justification for denying Daves equal opportunity. Management engaged in a long, odious pattern and practice of improperly controlling and diminishing Daves' once promising career prospects through the undue restriction of numerous critical employment opportunities that would have helped him prepare for advancement.  The game was, thus, rigged.

66.     In furtherance of its unlawful segregation scheme, Civil management at USAO historically and consistently assigned Daves, pursuant to a highly subjective and secretive selection process, the least desirable, least prestigious, most arduous (and often most emotion-laden) cases, the present discriminatory effects of which Daves still feels. With rare exception, plum assignments have been reserved for Caucasian and Asian attorneys, most of whom have now surpassed Daves in terms of litigation experience and accomplishments -- a set back that is irreversible.

67.     Daves' inferior assignments were not sporadic or discreet acts but rather part of a routine, regular practice or policy the continued application by which currently treats similarly situated employees differently to this day.

68.     In situations where attorneys have comparable education, seniority, and work appraisals, the fact that some have gotten more complex and varied cases gives them a considerable advantage and may weigh crucially in determining who ultimately is deemed better qualified for advancement.  This is particularly true where, as here, serious

questions of impermissible bias exist among decisionmakers who have consistently exhibited a tendency to like or dislike employees based on mental associations between a social group and certain traits, favorable or unfavorable.

69.     Management's discriminatory practices have rendered Daves significantly less competitive for promotion, as evidenced by the denial to Daves of a supervisory-level promotion.   The complex cases given to Daves' peers were invaluable learning experiences.   Working up a complex medical malpractice case could easily be, for instance, the functional equivalent of attending a two-week training seminar in that highly technical field of practice.   The repeated failure to provide Daves the same or similar types of invaluable learning experiences that his colleagues have received amounts to an unjustifiable failure to train him in subject areas that are potentially career-enhancing.

70.     The disparate treatment to which Civil management subjected Daves did not end with the discriminatory case assignment practices.   When Daves first started engaging in protected EEO activity, and then actively pursued cases that management deemed off-limits, management singled Daves out for surreptitious paper-trailing.   While continuing to lavish praise, thereby placating Daves and raising unrealistic expectations, they secretly plotted to build a case against him.   They began secretly scrutinizing his work and subjecting him to tests -- a fact that Daves' present supervisor subsequently confirmed.

71.     All these facts present a convincing mosaic, if not a clear acknowledgement, that the disparate treatment experienced by Daves was *because of* his race, gender and EEO activity.   Once Daves started expressing a desire to expand his knowledge base and

take on more challenging assignments, all his supervisors had to do was treat Daves like an equal.  This, they simply could not bring themselves to do.

72.    By collecting damaging facts pertaining or relating to Daves' employment, without giving Daves an opportunity to respond to any of those facts, Weidman was setting the stage and laying a foundation for future disciplinary action, including termination if possible, and manufacturing a defense that management could use, if necessary, in future litigation -- a skillful form of employment sabotage.

73.    Even though the direct or indirect evidence of discrimination may not consist of blatantly obvious signs, such as the frequent use of offensive racial or gender epithets, it exists in most subtle but no less harmful forms, revealed by the striking confluence of such multiple factors as:  the display of doubts and fears about Daves that were not exhibited about his white counterparts, the multiple incidents of suspicious timing, the numerous revealing statements, and the often starkly superior treatment Daves' similarly situated colleagues have received.

74.    The disparate treatment to which Daves was subjected was not supported by legitimate, non-discriminatory reasons, and any and all reasons proffered by management to date were pre-textual.  Title VII does not excuse the offending disparate treatment, even if it can be shown that similarly situated African-American attorneys who challenge traditional gender norms were also treated more favorably than Daves, in material respects.  First, not all of those attorneys expressed a desire to litigate the types of cases that Daves wished to litigate.  Second, the USAO has consistently treated similarly

situated attorneys outside Daves' combined protected classes more favorably, suggesting a heightened level of distrust or fear of Daves' particular combination of immutable attributes.  Title VII does not require that *all* other members within the plaintiff's class be similarly or comparably mistreated for a violation to be firmly established.

75.    The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular adverse action or collection of adverse actions at issue. Moreover, the retaliation that Daves sustained had discriminatory aspects, in that management responded better to white males who complained of disparate treatment in their case assignments.  For this reason, although any attempt to separate Daves' identity at the intersections of race, gender, and EEO participation could distort or ignore the particular nature of his experience, Daves also asserts separate claims based on each impermissible factor, as well as claims based on the combination of impermissible factors, as well as a disparate treatment claim specifically based on facts supporting his retaliation claim, which is set forth below.

76.    As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

SECOND AMENDED COMPLAINT

## SECOND CAUSE OF ACTION:

## HOSTILE WORK ENVIRONMENT BASED ON

## RACE, GENDER, AND RETALIATION FOR EEO PARTICIPATION

77.     Paragraphs 1 to 76 are incorporated here by reference.

78.     A reasonable African-American man would easily find that the discriminatory atmosphere that has long characterized Daves' workplace sufficiently polluted his experience, even before the day Daves subjectively identified the racial, gender, and retaliatory animus underlying it.  By making it much more difficult for Daves to do his job, take pride in his work, and desire to stay on in his position, management effected an additional violation of Title VII.  The segregationist employment practices used by USAO management turned Daves' work environment into a type of apartheid. The covert nature of those practices does not immunize USAO from responsibility.  Title VII provides no safe harbor for any race, gender or retaliation abuse, regardless of how crafty or subtle the delivery.

79.     Daves has not merely been shunned.  The prevalence of disparities evocative of racial and gender-based hierarchies was significant exacerbating factors in terms of the severity of the workplace hostility.  The employment barriers and restrictions that were set in place years ago because of Daves' failure to meet certain stereotyped race and gender-based expectations had the intended effect of isolating Daves to such a degree that the discriminatory insult permeated virtually all aspects of his workplace.

/ / /

80.     To subject Daves to a persistent pattern of unspoken sabotage in order to raise serious questions about his intelligence or competency was to shackle him at the ankles; the very fact that management raised false questions was damage enough, in this society.  The same was true for persistently negative baseless actions designed to raise questions about Daves' masculinity, strength, or readiness for "hard-ball" litigation.

81.     At the same time, management's contemptuously preemptive conduct rendered Daves helpless to challenge its persistently unlawful practices.  Given his immutable traits, Daves was naturally conspicuous, making it virtually impossible for him to maintain even an appearance of dignity in the face of the subservient role he has been forced to play.

82.     Although management coupled its discriminatory case assignment practices and other manipulations with additional insulting conduct and comments intended to demoralize Daves, no further insult was necessary for material, lasting damage to be done.  Daves' white supervisors, who were rarely victims of racial assault, may have viewed their collective actions in a vacuum without a full appreciation of how Daves, given his experiences in life, perceived them.  They may have thought that they actions and comments were innocent or only mildly offensive.

83.     But, in reality, to Daves the actions were intolerably threatening not just to his long-range career aspirations but to his basic concepts of job security and livelihood.  The same can be said for the offensive conditions that exemplified gender-based animus

/ / /

emanating from management's view that Daves failed to exhibit sufficient attributes stereotypically associated with his gender.

84.     Submission to the unwelcome subservient role was made an explicit term or condition of Daves' employment, the moment Weidman told Daves on January 31, 2008 that he was further justified in denying him the cases he wanted because he had hired him as a "Title VII lawyer."

85.     As oppressive as his work conditions had become before Daves filed his complaint, they grew much worse once Daves took action to expose the discrimination.

86.     As for Daves' supervisors in Civil, they were no longer able or willing to conceal their antipathy and contempt behind common workplace courtesies.  The pre-existing, veiled hostility rose to the surface, in close and suspicious temporary proximity to Daves' opposition practice.  From that point on, Daves experienced mistreatment stemming from an imbalance of power and a capitalizing on that imbalance at Daves' expense, fostering a sense of degradation in Daves.

87.     The post-complaint hostility, which systematically and continuously deprived Daves of the right to participate in the workplace on equal footing with other AUSAs, did not stop at open snubs and discourtesies.  It devolved into a steadfast and continual failure to engage in good-faith interactions regarding Daves' case-related requests and complaint-related inquiries.  It then escalated to outright vengeance, the point where even the EEO office of EOUSA, which was charged with investigating Daves' complaint, responded not

/ / /

just combatively but spiteful, lashing out at him with statements only the most amateur of litigation adversaries would make, like "you can dish it out, but you can't take it!"

88.     That management's antipathy was mostly covert and subtle, as opposed to overt and direct, made the work environment that Daves endured no less oppressive than it would have been had Daves been subjected to a daily overt barrage of racial and gender-based epithets.  Through years of planned and rehearsed dishonesty, management was able skillfully to confine Daves to a subordinate, demeaning status bearing no relation to his education, training, work record, or commitment to the office.  Endeavoring to take his career from him was management's way of saying to Daves "get out."

89.     The humiliation and abuse to which Daves was continually subjected were unlawfully based on his race, gender, and EEO participation.  Notably, Civil management's actions have consistently evinced an invidious process of favoritism and selection, where AUSAs are either preferred or disfavored based on their race, gender, EEO participation, or some combination of these protected classifications.  Management's support of Daves would have been appreciably stronger if he were not African-American, did not exhibit gender characteristics that management found off-putting, and accepted his subordinate position without complaint.  In fact, when Daves litigated the cases management saw fit to give him, his supervisors gladly left him alone, for the most part.

90.     Civil management's harassing conduct, coordinated through the Front Offices of the USAO and EOUSA, made it much harder for Daves to complete his work, made him "an object lesson about the perils of complaining," created a work environment

in which co-workers felt compelled to distance themselves from and avoid associating with him or seeking his guidance and counsel, negatively impacted his future career prospects in material respects as evidenced in significant part by the denied promotion, thwarted his short and long-term career goals and aspirations, negatively affected his future career prospects, and thus effectively eliminated any threat he, and persons like him, might otherwise have posed to entrenched managerial authority.

91.    Daves' present hostile work environment will continue for as long as the present managers retain their positions.  Indeed, the workplace oppression is sufficiently extraordinary and egregious as to overcome the normal motivation of a competent, diligent, and reasonable employee to remain and earn his livelihood and serve his employer.  Even though Daves has continued to work at USAO, which essentially mitigates his damages, management's pattern and practice of harassment has created a work environment in which a reasonable person could easily conclude that he has no rational alternative but to resign.

92.    The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular set of circumstances at any particularly time.  For this reason, although any attempt to separate Daves' identity at the intersections of race, gender, and EEO participation could distort or ignore the particular nature of his experience, Daves also asserts separate hostile work environment claims based on each impermissible factor, as well as claims based on the combination of impermissible factors.

93.     As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

## THIRD CAUSE OF ACTION:

## RETALIATION

94.     Paragraphs 1 to 93 are incorporated herein by reference.

95.     Under Title VII, the adverse actions comprising the retaliatory hostile work environment fit the paradigm for an actionable retaliation claim as well.  As with each of the other claims, there is both direct and indirect evidence supporting this claim.  Besides the mosaic of convincing facts establishing an intent to punish Daves for asserting his EEO rights, particularly after he lodged the complaint giving rise to this action, a reasonable employee would have found the challenged retaliatory actions to which Daves was subjected materially adverse, such that they might well have dissuaded a reasonable employee of the USAO from making or supporting a charge of discrimination.  Further, the materially adverse actions were causally linked to Daves' protected activity.

96.     As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career

expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

### SIXTH CAUSE OF ACTION:

### ADVERSE IMPACT BASED ON

### RACE, GENDER & EEO PARTICIPATION

97.    Paragraphs 1 to 96 are incorporated here by reference.

98.    Management has employed and continues to employ facially neutral employment  policies and practices that have had the effect of disproportionately excluding persons in AUSA Daves' protected classes, including race, gender, EEO participation, or some combination thereof.  For example, management has assigned cases in accordance with a "point" system, pursuant to which minority attorneys or EEO participants, historically received a disproportionate number of the lowest profile, most burdensome, and least desirable cases.

99.    The disparate impact discrimination and retaliation experienced by Daves was *because of* his race, gender and EEO activity.  The impermissible factors of race, gender, and EEO activity influenced management's decision-making collectively, individually, or in some combination thereof depending upon the particular neutral policy or practice at issue.  For this reason, Daves asserts separate claims based on each impermissible factor, as well as claims based on the combination of impermissible factors.

/ / /

100.    As a result of the unlawful conduct, Daves has suffered, and will continue to suffer, injury and damages in the form of lost income, lost reputation and professional status, lost professional and personal opportunities, lost short and long-term career expectations and satisfaction, lost ambition and motivation, substantial and increasing humiliation, lost belief and faith, deteriorating health and well-being, significant and increasing emotional distress, and other actual damages in an amount to be proved at trial.

## REQUEST FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Daves respectfully requests that this Court enter judgment for him and against the defendant and that the judgment include the following relief:

1.    A preliminary and ultimately permanent injunction that orders the DOJ and the USAO, through concrete measures specified in a negotiated consent decree, to:  (1) correct at the local and national levels, any and all past unlawful employment policies, procedures and practices from which this action arose; (2) institute and implement firm, enforceable prospective measures that require Defendant to treat Daves, and employees like him, on a consistently and permanently lawful and equal basis with those similarly situated AUSAs who have historically received more favorable treatment, particularly with respect to recruitment, hiring, training, and career development through case assignments, promotions, and other employment opportunities; and (3) take any and all necessary affirmative measures, including but not limited to transferring, demoting, or

removing any and all offending officials from the positions they held during the time periods giving rise to this action, in order to ensure that all AUSAs in the Civil Division have a reasonable opportunity to enjoy a work environment responsibly free from unwarranted and unlawful hostilities, harassment, intimidation, ridicule, and abuse;

2.      A preliminary and, later, permanent injunction awarding Daves and other AUSAs in Daves' protected classes any and all duties and responsibilities that they earned or would have earned but for the unlawful discriminatory and retaliatory conduct of the offending officials, including but not limited to reinstating Daves and any other constructively discharged employees to their official positions of record and promoting them to management-level supervisory positions in or outside the Civil Division;

3.      Daves' actual damages, including but not limited to back and front pay and other wages and benefits, as determined at trial;

4.      compensatory damages, including but not limited to damages for the significant and increasing emotional distress that Defendant's unlawful conduct has caused Daves;

5.      Daves' attorney fees and costs under Title VII and the Equal Access to Justice Act;

6.      any and all appropriate remedies available under Title VII;

7.      pre- and post-judgment interest, to the maximum extent the law allows; and

/ / /

/ / /

SECOND AMENDED COMPLAINT

8.     all other relief as law and justice requires.


DATED:   November 18, 2009          Respectfully submitted,


MICHAEL L. COHEN, a PLC


By: */s/ Michael L. Cohen*
         Michael L. Cohen
         Attorney for the Plaintiff,
         IRA DAVES

SECOND AMENDED COMPLAINT

## JURY DEMAND

Plaintiff demands a jury trial per Fed. R. Civ. P. 38 on all issues that may be tried to the jury.

DATED:   November 18, 2009                    MICHAEL L. COHEN, A PLC


                                              By: */s/ Michael L. Cohen*
                                              Michael L. Cohen
                                              Attorneys for Plaintiff
                                              IRA A. DAVES

SECOND AMENDED COMPLAINT